**Andrew Dean**
**Osman Nawaz***
**Preethi Krishnamurthy**
**Joshua Brodsky**
**David H. Tutor**
**Alistaire Bambach**
**Neal Jacobson**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, New York 10004**
**(212) 336-0024 (Tutor)**
**Email: TutorD@sec.gov**
**\*Not admitted in U.S. District Court for the S.D.N.Y.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>-against-<br><br>INFINITY Q DIVERSIFIED ALPHA FUND,<br><br>Defendant. | **COMPLAINT**<br><br>22 Civ. _____ (     ) |

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against Infinity Q Diversified Alpha Fund (the "Mutual Fund" or "Defendant"), alleges as follows:

## SUMMARY

1.      The Mutual Fund commenced operations in September 2014 as an open-end mutual fund.

2.      As an open-end mutual fund, the Mutual Fund was required to satisfy investor redemption requests within seven days at the net asset value ("NAV") established on the day of the request.

3.      The Investment Company Act of 1940 requires that the NAV reflect the good faith, fair value of the Mutual Fund's underlying securities holdings.

4.      From at least February 2017 through February 2021 (the "Relevant Period"), the Mutual Fund's NAVs were materially and falsely inflated due to the mismarking of its NAVs by James Velissaris, the Chief Investment Officer of Infinity Q Capital Management, LLC, investment adviser to the Mutual Fund.  Velissaris mismarked the Mutual Fund's NAVs in order to inflate the reported value of the Mutual Fund to investors, to attract and retain capital, and to increase his own compensation

5.      As a result of the mismarking, investors in the Mutual Fund purchased and sold their holdings in the Mutual Fund at materially false valuations during the Relevant Period.

## VIOLATIONS

6.      By virtue of the foregoing conduct and as alleged further herein, Defendant violated Rule 22c-1 [17 C.F.R. § 270.22c-1] promulgated under the Investment Company Act of 1940 [15 U.S.C. § 80(a)-22(c)].

7.      Unless Defendant is restrained and enjoined, it will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8.      The SEC brings this action pursuant to the authority conferred upon it by Investment Company Act Section 42(d) [15 U.S.C. § 80(a)-41(d)].

9.      The SEC seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws and rule this Complaint alleges it has violated; (b) appointing

a special master pursuant to Fed. R. Civ. P. 53; and (c) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Investment Company Act Sections 42(d) and 44 [15 U.S.C. §§ 80(a)-41(d) & 43].

11.     Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

12.     Venue lies in this District under Investment Company Act Section 44 [15 U.S.C. § 80(a)-43].  Defendant may be found in or transact business in the Southern District of New York.

## DEFENDANT

13.     **Infinity Q Diversified Alpha Fund**, is a pooled investment vehicle within the meaning of Rule 206(4)(b)-8(b), [17 C.F.R. § 275.206(4)-8(b)] promulgated under the Investment Advisers Act of 1940.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

14.     **Trust for Advised Portfolios** ("TAP") is a Delaware statutory trust registered under the Investment Company Act as an open-end series management investment company, for which a major financial institution (the "Administrator") and its affiliates provide a range of services, including administration, and daily accounting and striking of the NAV. The officers of TAP are employees of the Administrator. Unlike large fund families, where the trust and its series are branded under the same sponsor or investment adviser, TAP includes series whose investment advisers are unrelated to each other. TAP purports to be a cost-efficient platform for

mutual fund advisers by providing a shared board, insurance, and other economies of scale. The Mutual Fund is a series of TAP.

15.     **The Board of Trustees of TAP** (the "Board") oversees the Mutual Fund. The chairman of the Board is an employee of the Administrator.

16.     **Infinity Q Capital Management, LLC** ("Infinity Q") is an investment adviser registered with the SEC and headquartered in New York, NY.  Infinity Q was organized as a Delaware limited liability company on April 7, 2014.  Infinity Q advised the Mutual Fund, which most recently reported a total NAV of approximately $1.73 billion in February 2021.

17.     **James Velissaris** ("Velissaris"), age 37, currently resides in Atlanta, Georgia. Velissaris was the founder and Chief Investment Officer ("CIO") of Infinity Q and exercised control over Infinity Q during the Relevant Period until he was removed on or about February 21, 2020.

**FACTS**

I.      **BACKGROUND**

      A.  **Mutual Funds.**

18.     A mutual fund is a type of SEC-registered investment company, or series thereof. Investment companies pool money from many investors and invest the money in stocks, bonds, short-term money-market instruments, other securities or assets, or some combination of these investments. The combined securities and assets the investment company owns are known as its portfolio. A mutual fund's portfolio is managed by an SEC-registered investment adviser.

19.     Investors in mutual funds buy their shares from, and sell/redeem their shares to, the mutual funds themselves. Mutual fund shares are typically purchased from the fund directly or through investment professionals such as brokers. Mutual funds are required by law to price

their shares each business day and they typically do so after the major U.S. exchanges close. This price—the per-share value of the mutual fund's assets minus its liabilities—is called the per share net asset value or "per share NAV."  Mutual funds must sell and redeem their shares at the per share NAV that is next calculated after the investor places a purchase or redemption order. This means that, when an investor places a purchase or redemption order for mutual fund shares during the day, the investor will not know what the purchase or redemption price is until the next per share NAV is calculated.

20.    A mutual fund is required under the Investment Company Act to calculate its NAV using the market value of its portfolio securities when market quotations for those securities are "readily available." If a market quote for a security is not readily available, the fair value of that security, as determined in good faith by the fund's board, must be used in order to calculate the NAV. a mutual fund's prospectus, available to investors, often describes its valuation procedures.

**B. Infinity Q and the Mutual Fund.**

21.    Infinity Q is an investment adviser within the meaning of Section 202(a)(11) of the Investment Advisers Act, [15 U.S.C. § 80b-2(a)(11)], and has been registered as an investment adviser with the SEC since May 6, 2014.

22.    Infinity Q purported to offer retail investors "access to investment strategies typically reserved for elite high net worth clients."  Infinity Q offered two principal products, one of which was the Mutual Fund.

23.    The Mutual Fund commenced operations in September 2014, and was organized as a series of the TAP, a multiple series trust structured as an open-end management investment company registered under the Investment Company Act.

24.     As an open-end mutual fund, the Mutual Fund was required to satisfy redemption requests within seven days at the NAV established on the day of the request.

25.     The Mutual Fund had thousands of investors, including at least one investor located in this District.

26.     The Mutual Fund's portfolio consisted primarily of cash and a variety of equity and over-the counter ("OTC") derivative positions, including swaps, which are not listed on a public exchange. The swaps held by the Mutual Fund were predominately variance swaps, the value of which was tied to measures of volatility.

### C.   Valuation Policies and Use of Pricing Service.

27.     In order to price the OTC derivative positions that constituted a significant portion of the Mutual Fund's holdings, Infinity Q, beginning in approximately 2016, identified, retained, and started using a third party pricing service—a well-known premium service that marketed itself as providing a comprehensive platform to structure and price derivatives, among other complex financial instruments.

28.     By 2017, the Administrator directly accessed from the pricing service the values generated through Infinity Q's use of the pricing service and used the reported values to calculate and publish the Mutual Fund's daily NAV.

### D.   The Mutual Fund's Mismarking of NAV and its Application to Suspend Redemptions.

29.     During the Relevant Period, Velissaris, the CIO of Infinity Q, mismarked and materially inflated the Mutual Fund's NAVs.

30.     As a result of the mismarking, during the Relevant Period, investors in the Mutual Fund purchased and sold their holdings in the Mutual Fund at materially inflated NAVs.

31.     As of the end of March 2020, as a result of Velissaris's and Infinity Q's

mismarking of the Mutual Fund's holdings, Infinity Q reported year-to-date returns for

institutional class shares in the Mutual Fund of 8.95%, one-year returns of 10.61%, three-year

returns of 8.72%, and five-year returns of 7.28%.

32.     The Mutual Fund grew steadily in the first few years from its launch in 2014,

from a reported NAV of $173 million at the end of 2017, to $428 million at the end of 2018, and

to $770 million at the end of 2019.

33.     By the end of 2020, the Mutual Fund's reported NAV had more than doubled to

$1.8 billion.

34.     On February 18, 2021, the day before the Mutual Fund suspended redemptions,

its reported NAV was approximately $1.727 billion.

35.     On February 22, 2021, Infinity Q and the Board filed an Application for an Order

pursuant to Section 22(e)(3) of the Investment Company Act (the "Section 22(e) Order") to

suspend redemptions in the Mutual Fund, which was approved by the SEC that same day.

36.     In its Section 22(e) Order Application, Infinity Q and the Board stated:

On February 18, 2021, based on information learned by the Commission staff and shared
with Infinity Q, Infinity Q informed the Fund that Infinity Q's Chief Investment Officer
had been adjusting certain parameters within the third-party pricing model that affected
the valuation of the Swaps.  On February 19, 2021, Infinity Q informed the Fund that at
such time it was unable to conclude that these adjustments were reasonable, and, further,
that it was unable to verify that the values it had previously determined for the Swaps
were reflective of fair value. . . .  As a result, the Fund was unable to calculate an NAV
on February 19, 2021, and it is uncertain when the Fund will be able to calculate an NAV
that would enable it to satisfy requests for redemptions of Fund shares.

The Fund and Infinity Q believe that the best course of action for current and former
shareholders of the Fund is to liquidate the Fund in a reasonable period of time,
determine the extent and impact of the historical valuation errors, and return the
maximum amount of proceeds to such shareholders.

37.     The Mutual Fund has informed shareholders that the mismarking of the Mutual

Fund's holdings had a material impact on its NAV since at least 2019. The Mutual Fund has

disclosed publicly on its website infinityqfundliquidation.com, that:

Alvarez & Marsal ("A&M") [which was retained to revalue the Mutual Fund's bilateral OTC derivatives positions] recently finalized its evaluation of the extent to which the Fund's Bilateral OTC Positions were overstated in prior periods and the effect on the Fund's NAV for prior periods.  Based on A&M's independent valuation, A&M concluded that the Fund's Bilateral OTC Positions were overstated at each month-end date from February 2017 through January 31, 2021.  When A&M's valuations are used for calculation of the Fund's NAV, the Fund's reported month-end NAV was overstated by less than 10% prior to October 31, 2019, more than 10% from October 31, 2019 through January 31, 2021, and for most months in 2020 it was more than 30% overstated.

38.     On February 17, 2022, the United States Attorney for the Southern District of New York unsealed an indictment charging Velissaris with federal securities fraud for his role in mismarking of the Mutual Fund's NAVs. According to the indictment, "Velissaris made false and misleading statements to investors and others concerning Infinity Q's process for valuing certain [OTC] derivative securities that made up a substantial portion of the holdings of the [Mutual Fund], and in fact fraudulently mismarked those securities in ways that did not reflect their fair value. Velissaris committed the mismarking scheme in order to inflate the value of the [Mutual Fund] as reported to investors, to attract and retain capital in the [Mutual Fund], and to increase his own compensation."

39.     The indictment further alleges that "Velissaris manipulate[ed] the purportedly independent third-party models that Infinity Q used for valuation . . . including, for example, by secretly manipulating the computer code used by the third-party's valuation software."

40.     Also on February 17, 2022, the SEC charged Velissaris with violating antifraud and other provisions of the federal securities laws for the same and related conduct concerning the mismarking of assets held by the Mutual Fund.

**CLAIM FOR RELIEF**
**Violation of Rule 22c-1 [17 C.F.R. § 270.22c-1] promulgated under the Investment Company Act [15 U.S.C. § 80(a)-22(c)]**

41.     The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 40.

42.     Defendant, directly or indirectly, singly or in concert, failed to calculate a fair market value NAV for the Mutual Fund from at least March 31, 2017 through and including February 18, 2021.

43.     By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, violated and, unless enjoined, will again violate Rule 22c-1 [17 C.F.R. § 270.22c-1] promulgated under the Investment Company Act [15 U.S.C. § 80(a)-22(c)].

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Infinity Q Diversified Alpha Fund and its agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Rule 22c-1 [17 C.F.R. § 270.22c-1] promulgated under the Investment Company Act  [15 U.S.C. § 80(a)-22(c)].

**II.**

Appointing a special master pursuant to Fed. R. Civ. P. 53 to, among other things, oversee expenses paid from the Mutual Fund and to administer a process to return the remaining funds to harmed investors.

## III.

Granting any other and further relief this Court may deem just and proper.

Dated: New York, New York
       November 10, 2022

 

_____

Andrew Dean
Preethi Krishnamurthy
Joshua Brodsky
David H. Tutor
Alistaire Bambach
Neal Jacobson
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office

Of Counsel                     100 Pearl Street, Suite 20-100
Osman Nawaz                    New York, New York 10004
                               (212) 336-0024 (Tutor)
                               Email: TutorD@sec.gov