UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                          :

SECURITIES AND EXCHANGE COMMISSION,   :   No. 22 Civ. 09608 (PKC)
                          :

          Plaintiff,             :
                          :

             v.                :
                          :

INFINITY Q DIVERSIFIED ALPHA FUND,   :
                          :

          Defendant.          :
                          :
-----------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF THE MUTUAL FUND
OPT-OUT PLAINTIFFS' MOTION TO INTERVENE FOR THE LIMITED
PURPOSE OF MODIFYING THE CONSENTED TO ORDER APPOINTING
SPECIAL MASTER AND IMPOSING LITIGATION INJUNCTION (ECF NO. 15)**

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ............................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ....................................................................... 5

    I.      The Infinity Q Mutual Fund ................................................................................................ 5

    II.     The Improper Valuation of the Mutual Fund's Assets ....................................................... 6

    III.    The Trustees, Administrator, Auditor, and Underwriter Ignore Significant Red Flags
          and Abdicate their Role as Gatekeepers of the Mutual Fund ............................................. 7

    IV.    Investors Lose Hundreds of Millions of Dollars when Redemptions Are Suspended and
          the Mutual Fund's Assets Are Liquidated ......................................................................... 8

    V.     U.S. Bank Attempts to Drastically Curb its Liability at the Expense of Innocent
          Investors ............................................................................................................................. 8

       A.   U.S. Bank Hires as a Trustee the Former Boss of the SEC Investigating Team ........... 8

       B.   U.S. Bank Negotiates a Paltry Class Settlement in New York State Court ................... 9

       C.   U.S. Bank Seeks a Litigation Injunction in Federal Court ........................................... 10

       D.   U.S. Bank Uses the Litigation Injunction to Attempt to Stay State Court Actions against It ..... 11

ARGUMENT ...................................................................................................................................... 12

    I.      The Global Injunction Should Be Limited to the Mutual Fund and the Trust, and
          Exclude U.S. Bank's Agents ............................................................................................ 12

    II.     The Global Injunction Violates the Due Process Rights of the Mutual Fund Opt-Out
          Plaintiffs. .......................................................................................................................... 15

    III.    The Global Injunction Impermissibly Removes the Mutual Fund Opt-Out Plaintiffs'
          State Court '33 Act Claims to this Court .......................................................................... 17

    IV.    The Global Injunction Violates the Anti-Injunction Act .............................................. 17

       A.   The Global Injunction Is Not Necessary to Aid this Court's Jurisdiction................... 18

       B.   The Global Injunction Is Not Necessary to Protect or Effectuate a Federal Judgment ....... 22

       C.   The Global Injunction Is Not Expressly Authorized by Congress. ............................. 22

    V.     The Special Master Is Impermissibly Conflicted, and the Court Should Vacate His
          Appointment. .................................................................................................................... 22

    VI.    The Court Should Grant the Mutual Fund Opt-Out Plaintiffs' Motion for Limited
          Intervention Under Rule 24(a) ......................................................................................... 23

CONCLUSION ................................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

PAGE(S)

**CASES**

*Brennan v. New York City Board of Education*,
  260 F.3d 123 (2d Cir. 2001)..................................................................................... 24

*Butler, Fitzgerald & Potter v. Sequa Corp.*,
  250 F.3d 171 (2d Cir. 2001)..................................................................................... 24

*CFTC v. Amaranth Advisors, LLC*,
  523 F. Supp. 2d 328 (S.D.N.Y. 2007)...................................................................... 22

*Credit Suisse First Boston, LLC v. Intershop Communications AG*,
  407 F. Supp. 2d 541 (S.D.N.Y. 2006)................................................................. 13, 14

*Cyan, Inc. v. Beaver County Employees Retirement Fund*,
  135 S. Ct. 1061 (2018) ............................................................................................. 17

*First Data Merchant Services LLC v. MM Development Co.*,
  2020 WL 2215457 (S.D.N.Y. May 6, 2020)............................................................. 25

*Fotochrome, Inc. v. Copal Co.*,
  517 F.2d 512 (2d Cir. 1975)..................................................................................... 20

*Globus v. Law Research Service, Inc.*,
  418 F.2d 1276 (2d Cir. 1969)................................................................................... 13

*Government Employees Insurance Co. v. Granovsky*,
  2022 WL 1810727 (E.D.N.Y. June 2, 2022)............................................................ 18

*Hecht v. United Collection Bureau, Inc.*,
  691 F.3d 218 (2d Cir. 2012)..................................................................................... 15

*In re Baldwin United Corp.*,
  770 F.2d 328 (2d Cir. 1985)..................................................................................... 21

*In re Colt Industries Shareholder Litigation*,
  77 N.Y.2d 185 (1991) .............................................................................................. 15

*In re Holocaust Victim Assets Litigation*,
  225 F.3d 191 (2d Cir. 2000)..................................................................................... 25

*In re Oceana International, Inc.*,
  49 F.R.D. 329 (S.D.N.Y. 1969)................................................................................ 24

*In re Purdue Pharmacueticals L.P.*,
  619 B.R. 38 (S.D.N.Y. 2020) ................................................................................... 14

*In re Reserve Fund Securities & Derivative Litigation*,
  673 F. Supp. 2d 182 (S.D.N.Y. 2009)...................................................................... 21

*International Design Concepts, LLC v. Saks Inc.*,
  486 F. Supp. 2d 229 (S.D.N.Y. 2007) ...................................................................... 25

*Jennings v. Boenning & Co.*,
  482 F.2d 1128 (3d Cir. 1973) ................................................................................... 22

*Jiannaras v Alfant*,
  27 N.Y.3d 349 (2016) ...................................................................................... 15, 16

*Kline v. Burke Construction Co.*,
  260 U.S. 226 (1922) ......................................................................................... 19, 20

*Lakenau v. Coggeshall & Hicks*,
  350 F.2d 61 (2d Cir. 1965) ...................................................................................... 19

*Marshall v. Chase Manhattan Bank*,
  558 F.2d 680 (2d Cir. 1977) .................................................................................... 18

*MasterCard International Inc. v. Visa International Service Association*, *Inc.*,
  471 F.3d 377 (2d Cir. 2006) .................................................................................... 23

*Medequa LLC v. O'Neill & Partners LLC*,
  2022 WL 3364294 (S.D.N.Y. July 26, 2022) ......................................................... 24

*Mitchum v. Foster*,
  407 U.S. 225 (1972) ................................................................................................ 18

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985) ......................................................................................... 15, 16

*Preble-Rish Haiti, S.A. v. Republic of Haiti*,
  2022 WL 2967633 (S.D.N.Y. July 27, 2022) ......................................................... 25

*Retirement System of Alabama v. J.P. Morgan Chase & Co.*,
  386 F.3d 419 (2d Cir. 2004) .................................................................................... 19

*SEC v. Navin*,
  166 F.R.D. 435 (N.D. Cal. 1995) ............................................................................ 25

*SEC v. Ripple Labs*, *Inc.*,
  2021 WL 4555352 (S.D.N.Y. Oct. 4, 2021) ........................................................... 25

*SEC v. Torchia*,
  2016 WL 7423189 (N.D. Ga. July 1, 2016) ............................................................ 25

*Smith v. Bayer Corp.*,
  564 U.S. 299 (2011) ......................................................................................... 18, 22

*Tachiona v. Mugabe*,
  186 F. Supp. 2d 383 (S.D.N.Y. 2002) ..................................................................... 24

*Thomson Kernaghan & Co. v. Global Intellicom, Inc.*,
  2000 WL 640653 (S.D.N.Y. May 17, 2000) ........................................................... 14

iv

*United States v. Schurkman*,
    728 F.3d 129 (2d Cir. 2013) ...................................................................... 21

*Vendo Co. v. Lektro-Vend Corp.*,
    433 U.S. 623 (1977) .......................................................................... 19, 22

*Wyly v. Weiss*,
    697 F.3d 131 (2d Cir. 2012) ...................................................................... 19

**STATUTES**

The Securities Act of 1933 ........................................................................ *passim*

15 U.S.C. § 77v .............................................................................. 17, 18

17 C.F.R. § 229.510 .............................................................................. 12

28 U.S.C. § 2283 .................................................................................... *passim*

## PRELIMINARY STATEMENT

This motion to intervene is brought by injured investors in the Infinity Q Diversified Alpha Fund (the "Mutual Fund").  Specifically, the investors seek relief from a broad injunction—entered against them without any notice or opportunity to be heard—purporting to prevent them from prosecuting their claims in New York state court under the Securities Act of 1933 (the "'33 Act"). The injunction prevents the prosecution of claims against not only the Mutual Fund, but a slew of third parties with statutory liability under the '33 Act, including, among others, the Mutual Fund's officers and underwriter.  The injunction is not only improperly broad, but is of unlimited duration and impermissibly selective.  The injunction permits the claims of injured investors to proceed if they decide to remain in a pending class action, but stays their claims if they exercise their due process right to opt out.  The injunction is impermissible for at least three reasons: (i) there is no basis here to stay claims against third parties with statutory liability under the '33 Act, and that stay undermines the joint and several liability imposed on issuers and third parties under the Act, (ii) it is inconsistent with the due process rights of injured investors to opt out of class action settlements, and (iii) it violates settled law under the Anti-Injunction Act, 28 U.S.C. § 2283.

In February 2021, investors were stunned when redemptions in the Mutual Fund were suspended and its assets were promptly liquidated because the Mutual Fund's investment advisor—Infinity Q Capital Management ("Infinity Q")—had been manipulating the valuation of the Mutual Fund's assets for years.  Although investors were told that the Mutual Fund's assets were worth approximately $1.8 billion, the liquidation produced only $1.3 billion, leaving a shortfall of half a billion dollars.

U.S. Bank is the sponsor of the Mutual Fund.  U.S. Bank and its agents were responsible for the Mutual Fund's regulatory compliance and oversight of the Mutual Fund's valuations. However, rather than diligently perform their duties, these actors abdicated their responsibilities

and permitted Infinity Q to manipulate asset valuations by hundreds of millions of dollars.  If they had been duly performing their duties, Infinity Q would not have been able to manipulate the valuations and investors would not have suffered massive losses.

Fortunately for investors, the Mutual Fund is a registered investment company and the false statements that were made to investors give rise to liability under the '33 Act.  Indeed, this is precisely the type of situation that Section 11 of the '33 Act was designed to address.  Section 11 imposes liability not just on the issuer of the securities, but also on all other third parties who have a role in the distribution of those securities to the public.  Those parties have independent statutory duties under Section 11 to serve as gatekeepers to protect the investing public.  Unless these actors can demonstrate that they were diligent in performing their duties, they are liable to investors for the investment losses suffered as a result of misstatements in the offering documents.  Here, since net asset values were misstated, there were admittedly misstatements for which those gatekeepers are jointly and severally liable unless they can prove, among other things, that they conducted adequate due diligence and could not have known of the misstatement.

The third parties involved in the distribution of shares in the Mutual Fund sprang into action after the massive securities fraud was revealed.  Apparently concerned about their own lack of diligence and their exposure to significant joint and several liability under the '33 Act, U.S. Bank and its agents set off on a path to drastically limit their liability under the guise of trying to return the Mutual Fund's remaining assets to investors.  First, they appointed the former Director of the New York Regional Office of the Securities and Exchange Commission ("SEC") as a Trustee of the Mutual Fund.  At that time, it was the New York office of the SEC that was investigating the Mutual Fund.  U.S. Bank's agents, who are liable under the '33 Act, then quickly entered into a class action settlement that required them to pay only a few million dollars to investors in return

for broad releases freeing them from any and all claims arising from the mispricing of the Mutual Fund's assets.  The proposed settlement will compensate damaged investors for less than 3% of the losses they suffered in connection with the liquidation of the Mutual Fund.

To ensure that no investors would be able to prosecute their own claims against the gatekeepers under the '33 Act, U.S. Bank caused the Mutual Fund to negotiate a settlement with the SEC that would appoint that same former head of the SEC's New York office as "Special Master" and require the SEC to jointly seek a litigation injunction from this Court prohibiting any other actions from proceeding.  The Mutual Fund did not notify the New York state court of this proposed litigation injunction.  Further, when it publicly announced the settlement with the SEC, the Mutual Fund Bank did not reveal the identity of the Special Master or his relationship to the SEC, and conspicuously omitted from its press release that it was seeking a broad litigation injunction of unlimited duration.  The SEC then presented the appointment of the Special Master and the litigation injunction as an unopposed, consented-to motion.  The parties failed to inform this Court that investors actually affected by the litigation were not being provided either notice of the motion or the opportunity to be heard.  On January 10, 2023, this Court entered the litigation injunction sought by U.S. Bank and its agents (ECF No. 15; the "Global Injunction").

The proposed intervenors (the "Mutual Fund Opt-Out Plaintiffs") are more than one hundred investors in the Mutual Fund who have attempted to exercise their constitutional right to opt out of a class action settlement.  However, as soon as they attempted to do so, the Mutual Fund's counsel disclosed the existence of the Global Injunction.  They therefore bring this intervention motion to modify the Global Injunction so that they can proceed with their own actions in state court.  There are three bases for why the Global Injunction should be modified to allow proposed intervenors' claims to proceed.

*First,* the Global Injunction is impermissibly broad in seeking to stay litigation against not only the Mutual Fund, but also certain third parties involved in the distribution of registered securities to the public. Injured investors have the right to adjudicate their claims under the '33 Act even if the Mutual Fund is liquidating and distributing all remaining assets. Indeed, the very purpose of joint and several liability under the '33 Act is to provide injured investors with the right to recover fully from solvent third parties in the event that the issuer becomes insolvent. The only basis for the scope of the Global Injunction is that those third parties may have future, theoretical indemnification claims against the Mutual Fund. But the SEC itself views such indemnification agreements as unenforceable and violative of public policy. Courts agree. Given these facts, the breadth of the Global Injunction is not appropriate or necessary for the benefit of investors.

*Second*, the Global Injunction violates the Mutual Fund Opt-Out Plaintiffs' due process rights because it substantively eliminates their right to exclude themselves from the class action settlement. Absent class members such as the Mutual Fund Opt-Out Plaintiffs have a constitutional right to opt out of the class settlement and to independently prosecute their own damages claims. However, the Global Injunction does not apply to the class action but enjoins those who opt out to prosecute their claims. It thereby imposes a substantial burden of the right to opt out that violates due process. Moreover, the Global Injunction effectively removes the Mutual Fund Opt-Out Plaintiffs' state court actions to federal court, which is prohibited.

*Third*, the Global Injunction as applied to the Mutual Fund Opt-Out Plaintiffs' state court actions violates the Anti-Injunction Act. Subject to three very narrow exceptions—none of which apply here—the Anti-Injunction Act prohibits a federal court from enjoining a state court proceeding. Here, Congress provided the state courts with concurrent jurisdiction over '33 Act claims, and the Anti-Injunction Act prohibits this Court from enjoining such claims.

*Finally*, in addition to narrowing the stay to allow proposed intervenors claims to go forward, the Global Injunction should be modified to appoint a new Special Master without ties to U.S. Bank and its agents.  The Special Master was appointed by a U.S. Bank executive at the same time the Special Master is supposed to be investigating claims on behalf of the Mutual Fund against that executive and other of U.S. Bank's agents.  U.S. Bank's agents have substantial liability to injured investors, are defendants in their opt-out suits, and should not directly or indirectly determine the distribution of the Mutual Fund's remaining assets.

**FACTUAL AND PROCEDURAL BACKGROUND**

## I.     The Infinity Q Mutual Fund

The Mutual Fund was launched as a vehicle to sell "to the masses" the investment strategies used to manage the private wealth of David Bonderman.  Bonderman created Infinity Q to serve as investment advisor to the Mutual Fund.  Infinity Q purchased and sold exotic securities known as "swaps" for the Mutual Fund.  A swap is a security in which two parties agree to exchange (*i.e.*, swap) payments based upon the performance of an underlying reference obligation such as an asset, security, index, or currency exchange.  The terms of a swap are typically memorialized in a written agreement, such as a term sheet or swap confirmation.

Because they are very liquid and readily accessible to average investors, mutual funds are heavily regulated and subject to numerous compliance requirements.  Bonderman's personal investment team did not have the preexisting infrastructure, regulatory expertise, or administrative support required to run a mutual fund, so they turned to U.S. Bank.  U.S. Bank has created a one-stop-shop for investment managers to create a mutual fund through its multiple series trusts.  For a fee, U.S. Bank will create a new "series" of one of its existing trusts for an unaffiliated investment manager to launch a mutual fund.  U.S. Bank, through its agents, manages all operations,

5

governance, servicing, and administration of the mutual fund, while the investment manager develops the mutual fund's investment strategy.

The Mutual Fund was created as a series of a U.S. Bank-sponsored multiple series trust called the Trust for Advised Portfolios ("TAP" or the "Trust").  TAP currently has seventeen different series or funds.  U.S. Bank appointed its affiliate, U.S. Bancorp Fund Services, LLC ("U.S. Bancorp"), as "Administrator" of the Trust.  U.S. Bancorp is thus responsible for the Trust's management and oversight, which includes appointing the Trust's Board of Trustees and the Trust's executive officers (who are all U.S. Bancorp employees).  U.S. Bancorp also selected an auditor for the Trust, EisnerAmper LLP ("EisnerAmper"), and an underwriter for the Trust, Quasar Distributors, LLC ("Quasar"), which was at the relevant time an affiliate of U.S. Bancorp.

In addition to the Mutual Fund, Infinity Q also acted as investment advisor to the Infinity Q Volatility Alpha Fund (the "Hedge Fund").  Infinity Q caused the Hedge Fund to purchase many of the same swap positions as the Mutual Fund, meaning that some of the positions held by both funds were identical.

## II.    The Improper Valuation of the Mutual Fund's Assets

The Mutual Fund was required by law to price its shares every business day based on the Mutual Fund's "Net Asset Value" ("NAV").  To calculate NAV, the Mutual Fund subtracted the value of its liabilities from the value of its assets.  Infinity Q was required to determine the fair value of the Mutual Fund's swap positions in order to calculate the daily NAV.  Infinity Q used a valuation service purchased from Bloomberg—called "BVAL"—to peg the fair value of its swaps.  The Trustees  and other agents of TAP were required to oversee these valuations.

Unbeknownst to investors at the time, from at least 2018 through February 2021, Infinity Q manipulated the valuations of the Mutual Fund's derivative positions.  The Chief Investment Officer of Infinity Q, James Velissaris ("Velissaris"), mismodeled numerous positions held by the

Mutual Fund, artificially inflating their values.  This mismodeling often boosted the value of a single position by millions of dollars and artificially inflated the Mutual Fund's NAV by hundreds of millions of dollars.  Velissaris repeatedly modeled derivative positions in BVAL in ways that did not match the true parameters set forth in the term sheets, and which were designed to produced inflated valuations.  These manipulations of the swap values had a material impact on the Mutual Fund's reported NAV.  At one point in 2020, that NAV was inflated by more than 65%.

### III.   The Trustees, Administrator, Auditor, and Underwriter Ignore Significant Red Flags and Abdicate their Role as Gatekeepers of the Mutual Fund

The Trust was responsible for ensuring the Mutual Fund's compliance with laws and regulations.  The U.S. Bancorp-appointed Trustees were meant to perform certain oversight activities with respect to the Mutual Fund to protect investors.  The Trustees established an Audit Committee and a Valuation Committee to assist them with their oversight responsibilities.  The Audit Committee reviewed EisnerAmper's audits of the Mutual Fund's financial statements, which were meant to include a comprehensive review of the basis for Infinity Q's valuations of the Mutual Fund's assets.  The Valuation Committee—comprised solely of U.S. Bancorp executives—separately reviewed Infinity Q's valuation of securities held by the Mutual Fund.  The Valuation Committee was supposed to gather and review "Fair Valuation Forms" from Infinity Q to support its valuations, which were then supposed to be reviewed and ratified by the Trustees.

If U.S. Bank and its agents had actually been performing these compliance and oversight functions, Velissaris would not have been able to manipulate the valuations of the Mutual Fund's assets.  Velissaris's massive overvaluations raised a number of red flags that were visible to the purported gatekeepers of the Mutual Fund.  For example, the counterparty valuations of the swaps showed that Velissaris manipulated valuations.  Velissaris also sometimes entered different valuations for identical swap positions held by both the Mutual Fund and the Hedge Fund.  As an

agent of both funds, U.S. Bancorp had access to these different valuations of identical positions. Furthermore, some of Velissaris's valuations were mathematically impossible. If the gatekeepers had been properly performing their oversight roles, there is no way Velissaris could have manipulated the Mutual Fund's NAV as he did.

## IV.   Investors Lose Hundreds of Millions of Dollars when Redemptions Are Suspended and the Mutual Fund's Assets Are Liquidated

On February 22, 2021, the Mutual Fund and Infinity Q sought and obtained an order from the SEC permitting the Mutual Fund to suspend redemptions. Shockingly, the Mutual Fund informed the SEC that it could not value some of its assets and provide an accurate NAV pursuant to which its securities could be traded because the SEC had informed it that Velissaris had been improperly manipulating the valuation of the Mutual Fund's swaps. The Mutual Fund requested that the SEC grant it permission to liquidate its holdings and cease operations.

The Mutual Fund liquidated its entire portfolio as of March 19, 2021. The liquidation generated $1,249,485,022 in proceeds. On February 18, 2021, the last date on which Velissaris's valuations were used to calculate the Mutual Fund's NAV, the Mutual Fund's NAV was reported as $1,727,194,949. Thus, the liquidation resulted in a loss of almost half a billion dollars to investors in the Mutual Fund, and likely significantly more.

## V.   U.S. Bank Attempts to Drastically Curb its Liability at the Expense of Innocent Investors

### A.   U.S. Bank Hires as a Trustee the Former Boss of the SEC Investigating Team

Rather than immediately distribute the liquidated proceeds to investors, U.S. Bank's agents set up procedures to minimize their liability and reduce their legal exposure. The SEC's New York Regional Office had begun investigating the Mutual Fund in 2020. In December 2021, as that investigation was coming to an end and the SEC was preparing to commence enforcement actions,

the former Director of the SEC's New York regional office, Andrew Calamari ("Calamari"), was appointed as a new Trustee of TAP.  The Trustees of the Mutual Fund then established a Special Litigation Committee ("SLC") to investigate potential claims on behalf of the Mutual Fund. Calamari was the only member of the SLC until March 2022, when another member was appointed.  Calamari currently serves as a Trustee of TAP and as Chair of the SLC.

The Mutual Fund received about $1.3 billion from liquidating its assets.  To deter investors from taking action against the Trust or its agents, U.S. Bank had the Mutual Fund make an interim distribution to investors in December 2021 of around $500 million, and a second interim distribution to investors of $170 million in mid-2022.  The remaining cash assets of the Mutual Fund—about $570 million—are held in a Special Reserve against the Mutual Fund's future and potential liabilities.

**B.      U.S. Bank Negotiates a Paltry Class Settlement in New York State Court**

Several putative securities class actions were filed against Velissaris, Infinity Q, TAP, U.S. Bancorp, TAP's officers, the Trustees, EisnerAmper, and Quasar in both state and federal court. None of these actions proceeded past a motion to dismiss.  In the late summer of 2022, the parties to the New York state and federal court class actions announced a proposed class action settlement, which would resolve all federal securities claims against all potential defendants, including U.S. Bank and its agents.  The parties sought approval of the settlement in New York state court.

Under the terms of the proposed settlement, the defendants would collectively pay $39.75 million, plus an additional $8.25 million if certain conditions are met.  Of this amount, TAP, the Trustees, and the officers of TAP are paying $4.6 million.  U.S. Bancorp is paying only $250,000. Class counsel is seeking an award of one-third of the settlement amount, plus reimbursement of expenses.  Thus, the total return to investors could be less than $25 million.  This recovery will

have to be shared by all investors in the Mutual Fund and the Hedge Fund, and represents only 2%-3%, at best, of their collective investment losses.

The notice of settlement distributed to class members advised them that they had the right to opt out of the class settlement to pursue individual claims.  Specifically, the notice read:  "If you do not want to receive a payment from the Settlement, or you want to keep the right to sue or continue to sue Defendants on your own about the legal issues in the Litigation, then you must take steps to get out of the Class.  This is called excluding yourself from, or 'opting out' of, the Class."  The notice did not advise class members that the defendants were seeking a litigation injunction in federal court that would render any opt-out right illusory.  Nor did the Mutual Fund inform the New York state court that it was seeking a litigation injunction from this Court.

### C.    U.S. Bank Seeks a Litigation Injunction in Federal Court

The class settlement will leave innocent Mutual Fund investors—including many retirement accounts of average Americans—uncompensated for hundreds of millions of dollars of losses.  Even if all of the remaining Special Reserve is distributed to investors, investors in the Mutual Fund will be left short by about half a billion dollars.  Although the Mutual Fund itself does not have cash assets beyond the Special Reserve, the purported gatekeepers of the Mutual Funds have significant assets.  The publicly traded holding company of U.S. Bank, has over half a trillion dollars in assets on its balance sheet, generates annual revenues of about $20 billion, and has a market cap around $75 billion.  Although U.S. Bank's agents claim to be indemnified by the Mutual Fund, the contractual indemnification provisions do not extend to negligent conduct and, in fact, they themselves may be required to indemnify the Mutual Fund.

To ensure that investors would not seek to recoup these losses from its agents, U.S. Bank had TAP appoint Christopher E. Kashmerick, a Senior Vice President of U.S. Bancorp—rather than any of TAP's "independent" trustees—to negotiate a settlement with the SEC under which

the Mutual Fund would appoint a Special Master to distribute the Special Reserve to investors, but which would also impose a litigation injunction on any investor claims except for the class action. On November 10, 2022, shortly after the class action settlement was announced and preliminarily approved, the SEC announced that it reached a settlement with the Mutual Fund. The SEC and the Mutual Fund asked this Court to appoint Calamari as Special Master.

Neither the SEC's nor the Mutual Fund's press release disclosed (a) the identity of the proposed Special Master or (b) that the SEC and U.S. Bank were seeking a litigation injunction. Thus, investors were not advised that, at the behest of a U.S. Bancorp executive, a Trustee of TAP was being appointed as Special Master or that a litigation injunction barring individual claims was being sought. Moreover, neither the SEC nor the Mutual Fund's press release disclosed that the SEC's investigation of, and settlement with, the Mutual Fund was conducted, supervised, and negotiated by SEC employees who worked under Calamari when he was the head of the SEC's New York Regional Office. Furthermore, when the SEC filed its motion on consent for an order appointing a special master and imposing a litigation injunction on November 23, 2022, and despite having established a website purportedly to provide information to investors, the Mutual Fund did not notify investors of the motion. Thus, this Court was asked to issue the litigation injunction without affected investors receiving notice or being provided an opportunity to be heard.

**D.    U.S. Bank Uses the Litigation Injunction to Attempt to Stay State Court Actions against It**

In light of the inadequacy of the class settlement, scores of Mutual Fund investors attempted to exercise their constitutional right to opt out of that action and instead pursue their own individual actions. In December 2022, the Mutual Fund Opt-Out Plaintiffs sent notices of exclusion to the class settlement administrator and then filed their own actions in state court under the '33 Act. The complaints allege violations of Sections 11, 12 and 15 of the '33 Act. On

January 10, 2023, this Court issued the Global Injunction. (ECF No. 15.) Counsel for the Mutual

Fund then e-mailed counsel for the Mutual Fund Opt-Out Plaintiffs to notify them of the Global

Injunction. In his first act as Special Master, Calamari earmarked an astounding $91 million—

nearly 16% of the investors' remaining funds—for paying legal fees, including those of his own

law firm, among others. For services in January 2023 alone, Calamari—in his dual role as Special

Master and SLC member—and his law firm are seeking more than $120,000 in compensation, to

be paid out of investor retirement savings being held hostage in the Special Reserve.

## ARGUMENT

I.   **The Global Injunction Should Be Limited to the Mutual Fund and the Trust,
     and Exclude U.S. Bank's Agents**

The Court should modify the Global Injunction to permit the Mutual Fund Opt-Out

Plaintiffs' state court actions to proceed against the defendants who are not a party to the SEC

action or the Trust: U.S. Bancorp, the Trustees, the officers of the Mutual Fund, and Quasar (the

"Non-Party Violators"; *see* ECF No. 15 Ex. A).[1]   The sole statutory authority for the Global

Injunction is Section 21(d)(5) of the Exchange Act, which allows the SEC to seek "equitable relief

that may be appropriate or necessary for the benefit of investors."   But neither the SEC nor the

Mutual Fund made *any* showing that including the Non-Party Violators within the scope of the

Global Injunction was "appropriate" or "necessary" to protect investors. In fact, the contrary is

true. The only basis for extending the stay to the Non-Party Violators is supposed indemnification

rights from the Mutual Fund. Yet the SEC's official position is that indemnification for securities

laws violations is "against public policy" and "unenforceable." 17 C.F.R. § 229.510. Providing

---

[1] The SEC has stated that the Global Injunction applies only to entities or individuals listed on
Exhibit A to the Global Injunction. (*See* ECF No. 26 at 1 n.1.) Thus, the Mutual Fund Opt-Out
Plaintiffs are pursuing their state law claims against EisnerAmper and Infinity Q and its executives
and controllers.

the Non-Party Violators with *de facto* blanket immunity from investors who have excluded themselves from the proposed class action settlement and wish to prosecute their own claims is not appropriate or necessary, and the Global Injunction should be modified to exclude claims against the Non-Party Violators.

The Mutual Fund Opt-Out Plaintiffs' state court actions allege that the Non-Party Violators violated Sections 11, 12, and 15 of the '33 Act. Those claims are wholly independent from any claims against the Mutual Fund. To view it otherwise would thwart the goal of Section 11 of the '33 Act in imposing liability on other statutory defendants to ensure that they are effective gatekeepers. The SEC nowhere explains how it is "appropriate or necessary for the benefit of investors" to predicate a stay on indemnification rights that the SEC believes violate public policy and are unenforceable.

In addition to the SEC's disapproval of indemnification for securities law violations, "[g]iven the risk that indemnification agreements will undermine the strong public policy underlying the anti-fraud provisions of the 1933 and 1934 Acts, courts are reticent to enforce them." *Credit Suisse First Bos., LLC v. Intershop Commc'ns AG*, 407 F. Supp. 2d 541, 546 (S.D.N.Y. 2006). In *Globus v. Law Research Service, Inc.*, the Second Circuit affirmed the district court's denial of indemnification where an underwriter had actual knowledge of material misstatements in an offering document. 418 F.2d 1276 (2d Cir. 1969). Although *Globus* involved intentional misconduct, "its analysis of public policy was explicitly based on Section 11 of the 1933 Act which establishes negligence as a basis for liability." *Intershop*, 407 F. Supp. 2d at 547. Thus, "[i]t is hardly surprising that courts in this district and elsewhere readily extended *Globus*'s reasoning to preclude indemnification in cases involving negligent misrepresentations." *Id.* In addition, "*Globus* has also been extended to prohibit indemnification of a party who settles

securities law claims without admitting fault, *unless* that party actually demonstrates that it is without fault."  *Id.*  Based on the allegations in the Mutual Fund Opt-Out Plaintiffs' state court complaints, it is unlikely that the Non-Party Violators will be able to seek indemnification against the Mutual Fund.  And that remote theoretical possibility should not shield the Non-Party Violators from the currently pending claims asserted against them by the Mutual Fund Opt-Out Plaintiffs.

In the related bankruptcy context, where Section 105(a) of the Bankruptcy Code—akin to Section 21(d)(5) of the Exchange Act—permits injunctions that are "necessary or appropriate to carry out the" Code—an action against a third-party may be enjoined only where "the injunction plays an important part in the debtor's reorganization plan or where the action to be enjoined will have an immediate adverse economic consequence for the debtor's estate."  *In re Purdue Pharms. L.P.*, 619 B.R. 38, 57 (S.D.N.Y. 2020).  Here, the Mutual Fund is being liquidated—not reorganized—and the Global Injunction requires the Special Master to propose a distribution plan within 90 days.  (ECF No. 15 ¶ II.2.C.)  The Mutual Fund Opt-Out Plaintiffs' state court actions will not proceed to verdict within the next three months.  Even if the indemnification agreements of the Non-Party Violators were enforceable (and they are not), staying actions against those non-parties is not necessary for the Mutual Fund to be liquidated.  *See Thomson Kernaghan & Co. v. Glob. Intellicom, Inc.*, 2000 WL 640653, at *15 (S.D.N.Y. May 17, 2000) ("Global is undergoing a liquidation under Chapter 7; there are no reorganization efforts that might be jeopardized by allowing the present litigation to proceed, even if the claims here ultimately result in an indemnification demand on Global.").  For the same reason, there are no "*immediate* adverse consequences" if the Mutual Fund Opt-Out Plaintiffs' state court actions against the Non-Party Violators were to proceed.  The Mutual Fund Opt-Out Plaintiffs have independent claims against the Non-Party Violators under the '33 Act, and those claims should be allowed to proceed.

## II.     The Global Injunction Violates the Due Process Rights of the Mutual Fund Opt-Out Plaintiffs.

In addition to being impermissibly broad, the Global Injunction—in its entirety—violates the Due Process Clause of the Fourteenth Amendment by substantively depriving the Mutual Fund Opt-Out Plaintiffs of their constitutional right to exclude themselves from the class and prosecute their own claims.  A claim for money damages is a property right that may not be stripped from a claimant without due process of law.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 807, 811-12 (1985).  Thus, before approving a settlement that releases claims for money damages against a defendant, a court must provide absent class members with notice and the opportunity to opt-out of the settlement so that they can pursue their own claims.  *Id.* at 812; *see also Jiannaras v Alfant*, 27 N.Y.3d 349, 351 (2016) (refusing to approve settlement that "would release and extinguish any and all damage claims . . . without affording class members an opportunity to 'opt out,' thereby prohibiting class members from pursuing any individual claims that are separate and apart from the class settlement").  This right is inviolate.  *See Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 222 (2d Cir. 2012).

The New York Court of Appeals has, on more than one occasion, found that a class settlement could not be approved because it deprived claimants of their right to prosecute their own claim for damages against the settling defendant.  *See, e.g., Jiannaras*, 27 N.Y.3d at 353 (affirming lower courts' refusal to approve settlement that released damages claims against defendants without affording class members the opportunity to  opt out); *In re Colt Indus. S'holder Litig.*, 77 N.Y.2d 185, 197 (1991) (vacating order denying class member's request for exclusion because settlement "purported to extinguish [class members'] damage claims . . . without giving them a chance to opt out of the class").

15

The Global Injunction eliminates the Mutual Fund Opt-Out Plaintiffs' constitutional right to opt-out of the class settlement. Although the class action settlement purports to give members the opportunity to opt out, when combined with the Global Injunction, that right is rendered completely illusory with respect to the Mutual Fund, TAP, and U.S. Bank's agents. The purpose of the opt-out right is to ensure that a property right is not taken from absent class members without their consent. *See Shutts*, 472 U.S. at 811-12. Absent class members have the right to pursue their own claims for money damages if they do not want those claims to be prosecuted on their behalf by the class representative. *See Jiannaras*, 27 N.Y.3d at 352 ("Opt-out rights ensure that class members will have option of pursuing individual actions for redress."). Here, none of the Mutual Fund Opt-Out Plaintiffs are located in New York, and thus all are absent class members. Although they submitted requests to be excluded from the class action settlement, the Global Injunction eliminates the very right that they were trying to protect in doing so by prohibiting them from pursuing claims outside of the class against the Mutual Fund, TAP, and U.S. Bank's agents. Thus, it violates the Mutual Fund Opt-Out Plaintiffs' due process rights.

The due process violation is exacerbated by the surreptitious way in which the Mutual Fund sought the Global Injunction. The Mutual Fund waited for the class settlement to be preliminarily approved by the New York state court before announcing a deal—brokered by a U.S. Bancorp executive—with the SEC to seek an injunction from this Court. When it announced the deal with the SEC, the Mutual Fund failed to disclose to investors that it was seeking the appointment of a TAP Trustee as Special Master and was also asking this Court to indefinitely enjoin all actions against U.S. Bank's agents except the class action. The motion was then presented to this Court as an unopposed consent motion. The Mutual Fund only disclosed the existence of the Global Injunction after it had been entered without opposition. This conduct offends traditional notions

of fair play and substantial justice. The Mutual Fund's backdoor attempt to deprive injured investors of their due process rights cannot and should not be countenanced.

**III.** **The Global Injunction Impermissibly Removes the Mutual Fund Opt-Out Plaintiffs' State Court '33 Act Claims to this Court**

If permitted to apply to the Mutual Fund Opt-Out Plaintiffs' state court actions, the Global Injunction will effectively and impermissibly remove the claims against the Mutual Fund, TAP, and U.S. Bank's agents to this Court. The Mutual Fund Opt-Out Plaintiffs' state court actions assert only claims under the '33 Act. But the '33 Act provides for concurrent state-court jurisdiction and explicitly prohibits the removal of cases under the Act from state court to federal court. *See* 15 U.S.C. § 77v(a). The Supreme Court recently reaffirmed that "[s]tate-court jurisdiction over 1933 Act claims . . . continues undisturbed" and that '33 Act cases may not be removed to federal court. *Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 135 S. Ct. 1061, 1069 (2018). In so doing, the Court rejected the argument that the Securities Litigation Uniform Standards Act permitted removal of '33 Act lawsuits, holding that "SLUSA did nothing to strip state courts of their longstanding jurisdiction to adjudicate class actions alleging only 1933 Act violations" and "[n]either did SLUSA authorize removing such suits from state to federal court." *Id.* at 1078. Thus, both Congress and the Supreme Court have emphatically stated that state-court '33 Act lawsuits cannot be removed to federal court. Yet the effect of the Global Injunction would be to channel the Mutual Fund Opt-Out Plaintiffs' state-court '33 Act claims against the Mutual Fund, TAP, and U.S. Bank's agents into this federal forum, thereby effectively removing them. This is barred by 15 U.S.C. § 77v(a) and the Supreme Court's decision in *Cyan*.

**IV.** **The Global Injunction Violates the Anti-Injunction Act**

The Global Injunction—in its entirety—also runs afoul of established federal law. Subject to some very limited exceptions, a federal court does not have the power to enjoin a state court

17

proceeding.  Although embedded in the principles of federalism, this rule has been expressly

codified by Congress for over two hundred years.  The Anti-Injunction Act, "first enacted in 1793,"

*Smith v. Bayer Corp.*, 564 U.S. 299, 306 (2011), provides:

> A court of the United States may not grant an injunction to stay
> proceedings in a State court except as expressly authorized by Act
> of Congress, or where necessary in aid of its jurisdiction, or to
> protect or effectuate its judgments.

28 U.S.C. § 2283.  There are "only three specifically defined exceptions" to the Act.  *Bayer*, 564

U.S. at 306  "[T]hose exceptions . . . are narrow and are not [to] be enlarged by loose statutory

construction": "[a]ny doubts as to the propriety of a federal injunction against state court

proceedings should be resolved in favor of permitting the state courts to proceed."  *Id.*  Here, the

Global Injunction violates the Anti-Injunction Act because it enjoins the Mutual Fund Opt-Out

Plaintiffs' state court claims against the Mutual Fund, TAP, and U.S. Bank's agents and does not

fall within one of the narrow exceptions.[2]

### A.    The Global Injunction Is Not Necessary to Aid this Court's Jurisdiction

The in-aid-of-jurisdiction exception—like the other exceptions to the Anti-Injunction

Act—must be construed narrowly.  The Supreme Court "has counseled caution in identifying new

applications of the exceptions" to the Anti-Injunction Act.  *Gov't Emps. Ins. Co. v. Granovsky*,

2022 WL 1810727, at *4 (E.D.N.Y. June 2, 2022).  For more than a century, the Supreme Court

---

[2] The SEC argues that it is not subject to the Anti-Injunction Act.  (ECF No. 26 at 5.)  But to avoid
the Act, the SEC must show that it has "superior federal interests" to the Mutual Fund Opt-Out
Plaintiffs' state-court actions.  *Mitchum v. Foster*, 407 U.S. 225, 235-36 (1972).  The SEC cannot
do so, including because (i) the Global Injunction was a joint effort between the SEC and the
Mutual Fund; (ii) a judgment has already been entered against the Mutual Fund here, resolving the
SEC's claims; (iii) federal securities laws do not preempt the field, *compare Marshall v. Chase
Manhattan Bank*, 558 F.2d 680, 683 (2d Cir. 1977) (ECF No. 26 at 5) (ERISA "regulate[d] the
field of employee benefit plans"); and (iv) the Mutual Fund Opt-Out Plaintiffs' state-court claims
were filed before the Global Injunction issued and are brought under the '33 Act, which provides
for concurrent state-court jurisdiction and prohibits removal, *see* 15 U.S.C § 77v(a).

has made clear that the Anti-Injunction Act does not permit a federal court to protect its jurisdiction by enjoining a state-court *in personam* action. *See Kline v. Burke Constr. Co.*, 260 U.S. 226, 235 (1922). As the Supreme Court explained, "a controversy is not a thing, and a controversy over a mere question of personal liability does not involve the possession or control of a thing, and an action brought to enforce such a liability does not tend to impair or defeat the jurisdiction of the court in which a prior action for the same cause is pending." *Id.* at 230; *see Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 641-42 (1977) (plurality opinion). The Second Circuit has stated that "[t]he Supreme Court has never held that a district court may enjoin a parallel *in personam* action under the 'in aid of jurisdiction' exception." *Wyly v. Weiss*, 697 F.3d 131, 138 (2d Cir. 2012); *see Ret. Sys. of Ala. v. J.P. Morgan Chase & Co.*, 386 F.3d 419, 426 (2d Cir. 2004) (similar); *Lakenau v. Coggeshall & Hicks*, 350 F.2d 61, 64 (2d Cir. 1965) (permitting federal anti-suit injunction to halt state-court *in rem* attachment proceeding, but not state-court *in personam* conversion action).

The Mutual Fund Opt-Out Plaintiffs' state court actions bring *in personam* claims under the '33 Act against TAP and U.S Bank's agents, among others. This Action was not brought *in rem*. (ECF No. 1 ¶¶ 41-43.) Nor did the appointment of the Special Master convert this Action into an *in rem* action against the Mutual Fund. Neither this Court nor the Special Master have control over the Mutual Fund itself; rather, the Global Injunction limited this Court's exclusive jurisdiction, and the Special Master's purview, to the Special Reserve. (ECF No. 15 ¶¶ I.1, II.2.) But it is undisputed that the Mutual Fund consists of more than simply the Special Reserve. Indeed, the SEC and the Mutual Fund agree that "the Fund's assets are composed of . . . the Special Reserve," as well as "the Fund's legal claims against third parties, and any rights of the Fund to insurance under any and all applicable policies." (ECF No. 15 at 2.) The Global Injunction provides that the Special Master "shall not manage or defend any litigation and claims against the

Fund, as all such litigation and claims shall be defended, on behalf of the Fund, by the Trust and its counsel." (ECF No. 15 ¶ II.4(ii).)  In addition, the Special Master "shall not manage or pursue any insurance related claims and litigation to which the Fund is a party" and "shall not manage or pursue any litigation or alternative dispute resolution proceeding pending or brought by the [Mutual Fund's] SLC." (ECF No. 15 ¶ II.4(iii), (iv).)  Thus, to the extent that this Court or the Special Master have *in rem* jurisdiction over any specific property, that jurisdiction is limited, at best, to the Special Reserve, and does not extend to the Mutual Fund.

The Mutual Fund Opt-Out Plaintiffs' state court actions are not brought against the Special Reserve, and do not seek a judgment against, or to interfere with, the Special Reserve.  Should the Mutual Fund Opt-Out Plaintiffs prevail in their claims against TAP and U.S. Bank's agents, they would receive *in personam* money judgments against those defendants.  There would no state-court judgment invading, or purporting to exercise jurisdiction over, the Special Reserve.[3]  The Global Injunction appears to acknowledge this, as it defines "prohibited actions" to "dissipate" or "diminish the value of the Special Reserve" to include only "enforcing judgments, assessments, or claims against the Fund or any Fund Assets" (ECF No. 15 ¶ V.10.C), without mentioning obtaining a money judgment against the Mutual Fund.  Moreover, even assuming that the Mutual Fund Opt-Out Plaintiffs' state court actions somehow attack the purported *res* of the Special Reserve (they do not), those actions would have priority, as they were filed on December 19, 2022, while the Global Injunction was not entered until January 10, 2023.  *See, e.g.*, *Kline*, 260 U.S. at 235.

---

[3] Although such a judgment may affect the rights of the Mutual Fund Opt-Out Plaintiffs in the distribution of the Special Reserve, the Second Circuit has long recognized that "[t]he establishment of a claim constituting the basis of the right to participate in the distribution of property in the possession of one court is often conclusively determined by a judgment obtained in another court." *Fotochrome, Inc. v. Copal Co.*, 517 F.2d 512, 517 (2d Cir. 1975).

The SEC relies primarily on *In re Reserve Fund Securities & Derivative Litigation*, 673 F. Supp. 2d 182 (S.D.N.Y. 2009), to argue that the Global Injunction does not violate the Anti-Injunction Act.  (ECF No. 11 at 8-9; ECF No. 26 at 5.)  But that decision is distinguishable on its facts.  In *Reserve Fund*, unlike here, the SEC provided notice of its intent to seek an anti-suit injunction, and provided an opportunity for shareholders to be heard.  *Reserve Fund*, 673 F. Supp. 2d at 190-91, 193.  Moreover, *Reserve Fund* entered a court-approved plan of distribution at the same time as the anti-suit injunction, unlike here, where the Special Master has been delegated authority to determine a plan of distribution.  *Id.* at 195-99.  *Reserve Fund* also relied on the fact that the court had taken control over the fund itself as a *res*.  *Id.* at 204.  That is not true here, where the Court and the Special Master have, at most, exercised jurisdiction over the Special Reserve, and not the Mutual Fund.

In all events, *Reserve Fund*—which is not binding on this Court—is wrong on the law. The court's analysis misconstrued the effect of state court actions against the fund in that case. The court noted that "[a] state court could grant relief to an individual claimant and siphon assets away from the res without regard to any equitable concerns."  *Id.* at 203.  But, as discussed above, money judgments do not siphon assets away from a *res*.  *Reserve Fund* also relied heavily on the Second Circuit's decision in *In re Baldwin United Corp.*, 770 F.2d 328 (2d Cir. 1985).  But to the extent that *Baldwin United* remains viable at all, it bears no resemblance to the circumstances here. *Baldwin United* "relied on . . . the case's extraordinary complexity and multidistrict nature, the fact that 18 of the 26 defendants had already settled, and the fact that there was a substantially significant prospect that [the remaining] 8 defendants [would] settle in the reasonably near future." *United States v. Schurkman*, 728 F.3d 129, 137-38 (2d Cir. 2013).  This is not a multi-district litigation proceeding:  it is an action by the SEC against a single defendant.  This action has not

been pending for years.  Nor is any desire of the SEC and the Mutual Fund to preserve the class

action settlement relevant.  That proposed settlement is not of this Action, and was reached in state,

rather than federal court, and thus does not involve the exercise of this Court's jurisdiction.[4]

**B.** **The Global Injunction Is Not Necessary to Protect or Effectuate a Federal Judgment**

The "relitigation exception" to the Anti-Injunction Act "permits a federal court to enjoin a

state proceeding only in rare cases, when necessary to 'protect or effectuate [the federal court's]

judgments.'" *Bayer*, 564 U.S. at 302.  The exacting standards for the exception are not met here.

The issue presented in the Mutual Fund Opt-Out Plaintiffs' state court actions is "not identical to

the one decided" in this Action.  *Id.*  Nor are the Mutual Fund Opt-Out Plaintiffs "bound by [this

Court's] judgment" against the Mutual Fund, as they are not parties to this Action.  *Id.*

**C.** **The Global Injunction Is Not Expressly Authorized by Congress.**

Neither the Exchange Act generally nor Section 21(d)(5) of the Act expressly authorize

enjoining state court actions.  Section 21(d)(5) was added by the Sarbanes-Oxley Act.  Nothing in

that Act's legislative history shows that "Congress recognized and intended the statute to authorize

injunction of state-court proceedings" or that the Act "altered the relationship between the States

and the Nation with respect to the protection of" rights.  *Vendo*, 433 U.S. at 633.

**V.** **The Special Master Is Impermissibly Conflicted, and the Court Should Vacate His Appointment.**

Calamari was appointed to the Mutual Fund's SLC to investigate potential claims that the

Mutual Fund may have against, among others, U.S. Bank's executives and agents.  After Calamari

---

[4] *See CFTC v. Amaranth Advisors, LLC*, 523 F. Supp. 2d 328, 337-38 (S.D.N.Y. 2007) ("[T]he All–Writs Act empowers courts to issue an injunction 'in aid of their respective jurisdictions'— not in aid of another forum's jurisdiction."); *Jennings v. Boenning & Co.*, 482 F.2d 1128, 1135 (3d Cir. 1973) ("[W]e emphasize . . . that here there was no federal court judgment to protect.  At issue was a state court judgment.").

was appointed to the SLC, TAP appointed Kashmerick, a U.S. Bancorp executive—rather than one of its "independent" trustees—to settle with the SEC on behalf of the Mutual Fund.  (ECF No. 6 at 9.)  As part of that settlement, the Mutual Fund agreed to the appointment of Calamari as Special Master.  Thus, Kashmerick delivered to the Special Master that role, while at the same time the Special Master is supposed to be (i) investigating potential claims on the Mutual Fund's behalf against, among others, Kashmerick and U.S. Bank's other agents, (ii) overseeing the Special Reserve (the remaining cash assets of the Mutual Fund), including determining a plan for its eventual distribution, and (iii) approving requests for payment from the Special Reserve for legal fees incurred by, among others, U.S. Bank's agents.  Making matters worse, Calamari also "served as director of the SEC's New York Regional Office from October 2012 through October 2017" (ECF No. 11 at 9-10), and, in that role, supervised all of the SEC attorneys who later investigated the Mutual Fund, brought this Action, and agreed to the Global Injunction.  Calamari has already earmarked a staggering $91 million—nearly 16% of the investors' remaining funds—for paying legal fees, including those of his law firm and the law firms of U.S. Bank's agents.  (ECF No. 26 at 4 n.4.)  For services in January 2023 alone, Calamari and his law firm are seeking more than $120,000 in compensation, to be paid out of the Special Reserve.  (ECF No. 31.)  Given that Calamari is hopelessly conflicted, this Court should vacate his appointment and instead appoint as special master someone with no ties to the Mutual Fund, the Trust, or U.S. Bank and its agents.

## VI.   The Court Should Grant the Mutual Fund Opt-Out Plaintiffs' Motion for Limited Intervention Under Rule 24(a)

The Mutual Fund Opt-Out Plaintiffs meet Rule 24(a)(2)'s requirements for intervention.

*See MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 389 (2d Cir. 2006).[5]

---

[5] Because the Mutual Fund Opt-Out Plaintiffs seek to intervene only for the limited purpose explained herein, they do not attach a "pleading."  Where, as here, "the position of the movant is apparent from other filings and where the opposing party will not be prejudiced, Rule 24(c) permits

**The Mutual Fund Opt-Out Plaintiffs Have a Substantial Interest in this Action.**
Rule 24(a)(2) requires only that the Mutual Fund Opt-Out Plaintiffs show an "economic interest" relating to the "property or transaction which is the subject of the action." *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 130 (2d Cir. 2001). The Mutual Fund Opt-Out Plaintiffs own shares of the Mutual Fund and thus have a claim to a certain portion of the Special Reserve. The Special Master, overseen by the SEC, will determine the distribution of the Special Reserve, and thus the Mutual Fund Opt-Out Plaintiffs have a substantial interest in this Action.[6]

**The Global Injunction Impairs the Mutual Fund Opt-Out Plaintiffs' Rights.** The Mutual Fund Opt-Out Plaintiffs have exercised their constitutional right to exclude themselves from the state court class action settlement, and have brought their own state-court actions. But the Global Injunction purports to prevent the Mutual Fund Opt-Out Plaintiffs from prosecuting claims against the Mutual Fund, TAP, and U.S. Bank's agents. Thus, in the absence of intervention, the Mutual Fund Opt-Out Plaintiffs' rights will be impaired.[7]

**The Mutual Fund Opt-Out Plaintiffs' Interests Are Not Protected by the Parties.** "[T]he burden to demonstrate inadequacy of representation is generally speaking minimal." *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179-80 (2d Cir. 2001). An identity of interest

---

a degree of flexibility with technical requirements." *Tachiona v. Mugabe*, 186 F. Supp. 2d 383, 393 (S.D.N.Y. 2002).

[6] *See, e.g.*, *Medequa LLC v. O'Neill & Partners LLC*, 2022 WL 3364294, at *3 (S.D.N.Y. July 26, 2022) (intervenor's claim that "specific money held" in disputed account belonged to it established "direct, substantial, and legally protectable" interest in action); *In re Oceana Int'l, Inc.*, 49 F.R.D. 329, 332 (S.D.N.Y. 1969) ("when a party seeks to intervene in a proceeding which could ultimately vitiate its title and right to possess property . . ., sufficient interest exists to intervene").

[7] *See Medequa*, 2022 WL 3364294, at *3 (absent intervention, "it will become more difficult for [intervenor] to protect its interest . . . and assert its claim"); *SEC v. Torchia*, 2016 WL 7423189, at *3 (N.D. Ga. July 1, 2016) (intervenors' ability to protect their property interest, "as a practical matter, will be impaired in the absence of intervention because they will be unable to prevent the policies from being sold by the Receiver").

exists where litigants "share the identical ultimate objective." *SEC v. Ripple Labs*, *Inc.*, 2021 WL 4555352, at *4 (S.D.N.Y. Oct. 4, 2021). Here, the parties' ultimate objective is opposite to the Mutual Fund Opt-Out Plaintiffs'. The parties together sought the Global Injunction, while the Mutual Fund Opt-Out Plaintiffs seek to modify that injunction. Thus, it is apparent that the parties do not—indeed, cannot—protect the Mutual Fund Opt-Out Plaintiffs' rights. *See Torchia*, 2016 WL 7423189, at *3; *SEC v. Navin*, 166 F.R.D. 435, 441 (N.D. Cal. 1995).

**This Motion Is Timely**. This Court has "broad discretion in assessing the timeliness of a motion to intervene, which defies precise definition." *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 198 (2d Cir. 2000). The Mutual Fund Opt-Out Plaintiffs filed their Pre-Motion Letter within a month of the Global Injunction.[8] There is no prejudice to the parties; indeed, this Action is closed and is not being actively litigated. (*See* ECF No. 8.)[9]

## CONCLUSION

For the reasons set forth above, the Court should (i) permit the Mutual Fund Opt-Out Plaintiffs to intervene in this Action for limited purposes; (ii) modify the Global Injunction to permit the Mutual Fund Opt-Out Plaintiffs' state court actions to proceed against the Mutual Fund, TAP, and U.S. Bank's agents or, at a minimum, against U.S. Bank's agents (other than the Mutual Fund and TAP); and (iii) vacate the appointment of Andrew Calamari as Special Master.

Dated: February 24, 2023

---

[8] *See Preble-Rish Haiti, S.A. v. Republic of Haiti*, 2022 WL 2967633, at *3 (S.D.N.Y. July 27, 2022) (intervention timely where "sought . . . a little more than a month after" order); *First Data Merchant Svcs. LLC v. MM Dev. Co.*, 2020 WL 2215457, at *2 (S.D.N.Y. May 6, 2020) (intervention timely "less than three months" after action commenced).

[9] Alternatively, the Court should permit intervention under Rule 24(b). The Mutual Fund Opt-Out Plaintiffs comfortably satisfy the Rule 24(b) considerations justifying permissive intervention. *See Int'l Design Concepts, LLC v. Saks Inc.*, 486 F. Supp. 2d 229, 235 (S.D.N.Y. 2007).

Respectfully submitted,

By: */s/ Lawrence M. Rolnick*
Lawrence M. Rolnick
Marc B. Kramer
Michael J. Hampson
Matthew A. Peller
**ROLNICK KRAMER SADIGHI LLP**
1251 Avenue of the Americas
New York, New York 10020
(212) 597-2800
lrolnick@rksllp.com
mkramer@rksllp.com
mhampson@rksllp.com
mpeller@rksllp.com

*Attorneys for Proposed Intervenors
The Mutual Fund Opt-Out Plaintiffs*

26