UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                            :
SECURITIES AND EXCHANGE         :
COMMISSION,                       :
                *Plaintiff*,    :
                       :
           v.            :        22 Civ. 9608 (PKC)
                       :
INFINITY Q DIVERSIFIED ALPHA FUND,  :
                       :
             *Defendant*.   :
                       :
----------------------------------------------------------------x

## **<u>MEMORANDUM OF LAW IN SUPPORT OF SPECIAL MASTER'S PROPOSED ORDER TO SHOW CAUSE AND APPLICATION FOR INJUNCTIVE RELIEF</u>**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ................................................................................................................ 4

     A.     The Fund and its Liquidation ............................................................... 4

     B.     This Action and the Litigation Injunction ............................................. 6

     C.     The Opt-Out Plaintiffs and the March Order ........................................ 7

     D.     The Stipulated Stay and its Termination ............................................. 10

     E.     The Fund's Special Reserve ................................................................ 11

DISCUSSION ................................................................................................................. 11

I.     This Court Should Permanently Enjoin All Claims Against The Fund, TAP, And The Indemnitees ............................................................................................................. 12

     A.     This Court Has Broad Authority Under the All Writs Act to Issue an Injunction to Protect its Jurisdiction and to Effectuate a Plan of Distribution ....................................................................................... 12

     B.     Permanent Injunctive Relief is Necessary to Protect this Court's Jurisdiction Over the Special Reserve and to Prevent the Dissipation of Fund Assets ....................................................................................... 13

     C.     Injunctive Relief is Necessary to Ensure that Similarly Situated Shareholders are Treated Equitably ................................................... 16

II.     The Opt-Out Plaintiffs' Objections are Without Merit ...................................... 18

     A.     Allowing Claims Against the Indemnitees to Advance Will Deplete the Special Reserve and Delay Distribution of the Special Reserve ........................ 18

     B.     Permanent Injunctive Relief Does Not Violate the Opt-Out Plaintiffs' Due Process Rights ......................................................................... 21

     C.     The Proposed Injunction Would Not "Effectively Remove" the Opt-Out Plaintiffs' Claims to Federal Court ................................................... 23

     D.     The Anti-Injunction Act is Inapplicable Here ..................................... 23

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Credit Suisse First Bos., LLC v. Intershop Commc'ns AG*,
    407 F. Supp. 2d 541 (S.D.N.Y. 2006) .................................................................................... 19

*Fidelity Mort. Inv. v. Camelia Builders, Inc.*,
    550 F.2d 47 (2d Cir. 1976) ............................................................................................... 21, 22

*Globus v. Law. Res. Serv., Inc.*,
    418 F.2d 1276 (2d Cir. 1969) ............................................................................................ 8, 20

*In re Baldwin-United Corp.*,
    770 F.2d 328 (2d Cir. 1985) ................................................................................. 3, 13, 14, 24

*In re Fuwei Films Sec. Litig.*,
    634 F. Supp. 2d 419 (S.D.N.Y. 2009) .................................................................................... 10

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
    650 F.3d 167 (2d Cir. 2011) ............................................................................................ 10, 19

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    2014 WL 4966072 (E.D.N.Y. Oct. 3, 2014) ........................................................................... 13

*In re Platinum-Beechwood Litig.*,
    378 F. Supp. 3d 318 (S.D.N.Y. 2019) .............................................................................. 15, 18

*In re Rsrv. Fund Sec. & Derivative Litig.*,
    673 F. Supp. 2d 182 (S.D.N.Y. 2009) ............................................................................ *passim*

*Kline v. Burke Const. Co.*,
    260 U.S. 226 (1922) ................................................................................................................ 25

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012) .................................................................................................... 10

*Petition of Singer*,
    205 B.R. 355 (S.D.N.Y. 1997) ............................................................................................... 21

*Phillips Petro. Co. v. Shutts*,
    472 U.S. 797 (1985) ................................................................................................................ 21

*SEC v. McGinn, Smith & Co.*,
    2016 WL 6459795 (N.D.N.Y. Oct. 31, 2016) ................................................................. 16, 17

*Stott v. Cap. Fin. Servs., Inc.*,
    277 F.R.D. 316 (N.D. Tex. 2011) ..........................................................................13

*United States v. Schurkman*,
    728 F.3d 129 (2d Cir. 2013)...................................................................................12

*Wisener v. Air Exp. Int'l Corp.*,
    583 F.2d 579 (2d Cir. 1978)...................................................................................18

**Statutes**

15 U.S.C. § 77v .....................................................................................................................23

15 U.S.C. § 80a-2...........................................................................................................15, 16

15 U.S.C. § 80a-17........................................................................................................19, 20

28 U.S.C. § 1651 ....................................................................................................3, 12, 16

28 U.S.C. § 2283.........................................................................................................8, 12, 23

**Rules**

17 C.F.R. § 229.508 ............................................................................................................20

17 C.F.R. § 229.510 ............................................................................................................20

17 C.F.R. § 270.22c-1 .........................................................................................................17

Fed. R. Civ. P. 65 ................................................................................................................13

## PRELIMINARY STATEMENT

Special Master Andrew M. Calamari, appointed pursuant to this Court's January 10, 2023 order, as amended on March 10, 2023, *see* ECF 38 (the "March Order"), respectfully submits this Memorandum of Law in Support of his Proposed Order to Show Cause and Application for Injunctive Relief permanently enjoining all current and future lawsuits against the Infinity Q Diversified Alpha Fund (the "Fund"); the Trust for Advised Portfolios ("TAP"), of which the Fund is one series; and the Fund's indemnitees (the "Indemnitees"): specifically, the Fund's current and former trustees and officers, and the Fund's distributor and underwriter, Quasar Distributors, LLC ("Quasar"). The requested injunction will have no effect on litigation brought by any shareholder against the Fund's administrator and accountant, U.S. Bancorp Fund Services, LLC ("USBFS"); its independent auditor, EisnerAmper, LLP ("EisnerAmper"); the Fund's independent investment advisor, Infinity Q Capital Management LLC ("IQCM"); or any persons or entities related to IQCM, including Bonderman Family Limited Partnership, LP, Infinity Q Management Equity LLC, James Velissaris, Scott Lindell, or Leonard Potter.

A permanent injunction is necessary to bar competing claims to the Fund's limited assets, to facilitate a final distribution of the Fund's remaining assets, and to ensure that all current shareholders are treated equitably. The Special Master respectfully requests that the Court grant expedited consideration of this Application.

The three pending lawsuits that are principally the subject of this Application were filed in New York Supreme Court by certain Fund shareholders who elected to opt out (the "Opt-Out Plaintiffs") of a separate securities class action settlement also in New York Supreme Court (the "Opt-Out Actions").[1] The class action settlement, approved by New York Supreme Court on

---

[1] Specifically, the Opt-Out Actions are *The Glenmede Trust Company, NA. v. Infinity Q Capital Management LLC, et al.*, No. 160830/2022 (N.Y. Sup. Ct. Comm'l Div.); *Carson Family 2013 Dynasty*

December 21, 2023, extinguished all claims against the Fund, TAP, and the Indemnitees, except for those asserted in the Opt-Out Actions.[2] Meanwhile, this Court's March Order, to which the Opt-Out Plaintiffs did not object, stayed the Opt-Out Actions against the Fund, TAP, and the Indemnitees, except for claims against USBFS and Quasar, subject to further order of the Court. March Order ¶ 12.

Pursuant to the March Order, the Special Master is charged with (i) overseeing and managing the Special Reserve established by TAP to pay the Fund's liabilities, including legal fees and expenses incurred in various litigations by the Fund, TAP, and the Indemnitees; and (ii) avoiding dissipation of the Fund's remaining assets. March Order ¶¶ 2.B, 2.C.[3] Paragraph 12.B of the March Order expressly authorizes the Special Master to move this Court to expand the existing litigation injunction to cover Securities Act claims brought against any non-natural persons to protect the Fund and effect a final distribution to Fund shareholders. The Special Reserve is currently approximately $100 million, which the Special Master has determined cannot be distributed as long as the Fund may be subject to liability, directly or indirectly, in the Opt-Out Actions. Because the Fund has obligations to advance legal fees incurred by certain Indemnitees, and may ultimately be liable to indemnify the Indemnitees for any judgments against them,

---

*Trust, et al. v. Infinity Q Capital Management LLC, et al.*, No. 160834/2022 (N.Y. Sup. Ct. Comm'l Div.); and *Flint Hills Diversified Strategies L.P., et al. v. Infinity Q Capital Management LLC, et al.*, No. 160964/2022 (N.Y. Sup. Ct. Comm'l Div.).

[2] *See In re Infinity Q Diversified Alpha Fund Securities Litigation*, No. 651295/2021 (N.Y. Sup. Ct. Comm'l Div.), Doc. No. 438.

[3] The Special Master was appointed to finalize the distribution of the Fund's remaining assets after the Fund and its Board of Trustees made two interim distributions on a *pro rata* basis pursuant to an Order by the U.S. Securities and Exchange Commission ("SEC") under Section 22(e)(3) of the Investment Company Act (the "22(e)(3) Order") authorizing the Fund to suspend redemptions in the Fund and to liquidate the Fund and distribute its assets to its shareholders. The Fund had filed an application with the SEC for the 22(e)(3) Order after the discovery of a mismarking scheme perpetrated by IQCM and its Chief Investment Officer, James Velissaris.

continuing litigation against such Indemnitees will only drain Fund assets. Indeed, any judgment obtained by the Opt-Out Plaintiffs against any of the Indemnitees would be tantamount to a judgment against the Fund itself since the Fund, as indemnitor, would be responsible for paying the judgment. This would result in a majority of shareholders inequitably compensating a small subset of other shareholders for their losses. But the assets of the Fund are not a potential pot of "damages" for the Opt-Out Plaintiffs; they are the remaining equity of the Fund in which *all* shareholders are entitled to share *pari passu*. The Opt-Out Plaintiffs' litigations are ramping up and discovery is just beginning. At the same time, the assets of the Special Reserve are quickly being expended, with approximately $10 million in attorneys' fees and costs having already been paid out to defend claims against the Fund, TAP, and the Indemnitees. An injunction is urgently needed.

The All Writs Act, 28 U.S.C. § 1651, empowers this Court to enter all writs "necessary or appropriate" in aid of its jurisdiction. Courts in the Second Circuit have long recognized that a limited fund is a *res* subject to the Court's exclusive jurisdiction, and that the Court has power to exercise its authority under the All Writs Act to protect the fund. *See In re Baldwin-United Corp.*, 770 F.2d 328, 336 (2d Cir. 1985); *see also In re Rsrv. Fund Sec. & Derivative Litig.*, 673 F. Supp. 2d 182, 202 (S.D.N.Y. 2009). The Court should exercise its authority here to (i) permanently enjoin all litigation against Quasar relating to the Fund, including the Opt-Out Plaintiffs' claims against Quasar;[4] and (ii) make permanent the litigation stay in the March Order enjoining all other litigation against the Fund, TAP, and the other Indemnitees (*i.e.*, the Fund's trustees and officers). The requested permanent injunction would not enjoin or otherwise affect the Opt-Out Actions, or

---

[4] On May 29, 2024, the Opt-Out Plaintiffs agreed to temporarily stay the actions against Quasar and USBFS. On July 10, 2024, the Opt-Out Plaintiffs gave notice that the temporary stay would expire on July 17, 2024. This Application is prompted by the termination of that stay.

any other shareholder litigation, with respect to any other parties, including USBFS and EisnerAmper.

## BACKGROUND

### A.    The Fund and its Liquidation

TAP is a Delaware statutory trust registered with the Securities and Exchange Commission (the "SEC") under the Investment Company Act of 1940. The Fund was formed as a series of TAP in September 2014 and was overseen by its trustees and officers. Ex. A, Declaration of Trust § 3.2. Quasar served as underwriter and distributor for the Fund. Ex. B, Distribution Agreement § 1. USBFS served as the Fund's administrator, accountant, and custodian. EisnerAmper served as the Fund's independent auditor.

TAP retained IQCM as an independent contractor to serve as the Fund's investment advisor. James Velissaris was IQCM's founder, majority owner, and Chief Investment Officer. The Fund's portfolio consisted primarily of cash and a variety of equity and over-the-counter derivative positions, principally swaps. The Fund's swaps were predominantly variance swaps, the value of which was tied to measures of volatility.

TAP agreed to indemnify and advance legal fees to the Fund's trustees and officers, *see* Ex. A, Amended Declaration of Trust § 6.4, and to indemnify and advance legal fees to Quasar. TAP's indemnification and advancement obligations to Quasar are set forth in the Distribution Agreement between TAP and Quasar. *See* Ex. B, Distribution Agreement § 8.A (indemnification); *id.* § 8.C (advancement).[5]

---

[5] Although TAP has indemnification (but not advancement) obligations to USBFS under certain conditions, TAP has alleged that USBFS failed to exercise reasonable care in the performance of its duties and, therefore, it is not entitled to indemnification. TAP has no indemnification or advancement obligations to EisnerAmper.

In February 2021, the Fund learned that Velissaris had been altering the parameters used to value the Fund's swaps and determined it could no longer rely on valuations provided by IQCM and Velissaris. With the approval of the U.S. Securities and Exchange Commission ("SEC"), the Fund suspended redemptions and proceeded to liquidate its positions in anticipation of distributing the Fund's remaining assets to its shareholders. TAP's board of trustees retained Alvarez & Marsal, a third-party valuation firm, to conduct an independent review of IQCM and Velissaris's valuations. The Fund thus learned that IQCM and Velissaris had been fraudulently inflating the valuations of the Fund's swaps for years, beginning in or around 2017 and escalating dramatically in 2020 during the COVID-19 pandemic. Alvarez & Marsal concluded that as of June 30, 2020, more than 36% of the Fund's purported net asset value as of that date had been fabricated by IQCM and Velissaris. After exiting its positions, the Fund was left with approximately $1.25 billion in cash and cash equivalents, leaving a nearly $500 million gap between the Fund's last reported net asset value of $1.73 billion and its actual value. As a result of this shortfall, the Fund cannot repay its shareholders in full.

The Fund appointed a Special Litigation Committee ("SLC") to evaluate potential claims arising out of these events that the Fund could bring against its third-party service providers. On April 26, 2024, the Fund brought suit against USBFS and EisnerAmper. *See Trust for Advised Portfolios ex rel. Infinity Q Diversified Alpha Fund v. U.S. Bancorp Fund Services, LLC, et al.*, 652179/2024 (Sup. Ct. N.Y. Cnty. filed Apr. 26, 2024). To the extent the Fund prevails on these or any other claims, or to the extent any such claims are settled, the Fund's net recovery will be distributed to shareholders.

Between February 2021 and August 2022, a number of private securities actions were filed against the Fund in state and federal court. These lawsuits were consolidated into a federal action

and a state action and, as discussed further below, the parties worked to resolve these litigations through mediation (the "Mediated Securities Class Actions").

### B.    This Action and the Litigation Injunction

The SEC filed this action on November 10, 2022. ECF 1. On November 23, 2022, the SEC requested that this Court "appoint a special master and impose a litigation injunction." ECF 11 at 4. The proposed injunction was broad: with limited exceptions,[6] the SEC proposed to stay all "Ancillary Proceedings," defined as:

> [a]ll pending or future civil legal proceedings of any nature, including, but not limited to, securities litigation, derivative litigation on behalf of the Fund or on behalf of the Trust relating to the Fund (including without limitation any demands upon trustees of the Fund and/or series trustees of the Fund to take any action or commence any derivative litigation), bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, books and records demands under Delaware law or other actions of any nature involving: (a) the Special Master, in the Special Master's capacity as Special Master; (b) the Fund or any Fund Assets, wherever located; and (c) the civil actions against any and all purported Indemnitees as defined and limited by Exhibit A to this Order,[7] as may be supplemented by the Special Master and/or counsel to the Trust upon Court approval, that seeks a judgment or award that would be payable or subject to indemnification by the Fund (all such proceedings are hereinafter referred to as "Ancillary Proceedings").

ECF 12 at 12-13. In particular, the SEC sought to enjoin "all courts having any jurisdiction [over such cases] . . . from taking or permitting any action until further Order of this Court." *Id.*

---

[6] The exceptions were "(i) the instant proceeding, (ii) all police or regulatory actions and actions of the Commission related to the above-captioned enforcement action, (iii) all actions pending or to be brought by the United States of America or any of its agencies, (iv) the Mediated Securities Class Actions, (v) any litigation or alternative dispute resolution proceeding pending or to be brought by the SLC in connection with Fund Litigation Claims, (vi) the derivative action styled *Rowan v. Infinity Q Capital Management, LLC, et al.*, C.A. No. 2022-0176-MTZ (Del. Ch.) (the "*Rowan* Action"), and (vii) any litigation relating to any insurance policy under which the Fund is an insured." ECF 12 at 11-12.

[7] Exhibit A to the proposed order listed "a non-exhaustive list of parties who are contractually indemnified by the Fund: Current and former trustees of the Fund, including the series trustees of the Fund[;] Current and former officers of the Fund[;] Quasar Distributors, LLC[; and] U.S. Bancorp Fund Services." ECF 12 at 22.  As used herein, "Indemnitees" does not include USBFS, which, as noted above, the Fund has determined has not met the requirements for indemnification.

On January 10, 2023, this Court entered the proposed order on consent (the "January Order"). ECF 15. The January Order vested this Court with "exclusive jurisdiction over the Special Reserve and all matters arising out of, and related to, the Special Reserve," January Order ¶ 1, and appointed Andrew M. Calamari as special master. *Id.* ¶ 2. The Court granted the parties' request for a stay of all Ancillary Proceedings[8] and held that "all courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court." *Id.* ¶ 15. The January Order expressly carved out from the stay the Mediated Securities Class Actions, a separate derivative case brought in Delaware (the "*Rowan* Action"), and a few others not relevant here. *See id.* ¶ 12(B).[9]

### C.    The Opt-Out Plaintiffs and the March Order

In August 2022, the parties to the Mediated Securities Class Actions reached a proposed settlement and moved the state court to approve the settlement. In December 2022, the Opt-Out Plaintiffs sent notices of exclusion to the class settlement administrator and filed their own actions in New York Supreme Court, alleging violations of Sections 11, 12, and 15 of the Securities Act of 1933.

Counsel for USBFS notified the Opt-Out Plaintiffs of the January Order promptly after its issuance. In February 2023, the Opt-Out Plaintiffs moved to intervene in this case to challenge the litigation injunction imposed by the January Order.[10] ECF 23, 33. The Opt-Out Plaintiffs offered four principal arguments in opposition to the injunction:

---

[8] As used in this memorandum of law, the term "Ancillary Proceedings" has the same definition as that used in the SEC's November 23, 2022 application. *See* ECF 11 at 4.

[9] The *Rowan* action has since been dismissed and is, therefore, no longer relevant.

[10] The Opt-Out Plaintiffs also challenged the appointment of Mr. Calamari as the Special Master. ECF 23 at 4-5; ECF 34 at 27. Pursuant to this Court's March 10, 2023 Order, the Opt-Out Plaintiffs' motion was "deemed withdrawn without prejudice." March Order ¶ 31.

- *First*, the Opt-Out Plaintiffs argued that the injunction was overbroad because it enjoined actions against USBFS, Quasar, and the trustees and officers, whose contractual indemnification rights may ultimately be deemed unenforceable. ECF 34 at 17-18. In support, the Opt-Out Plaintiffs noted the SEC's position that it is against public policy to indemnify violations of the Securities Act of 1933 and that, where the party seeking indemnification had actual knowledge of the misstatement, courts have agreed. ECF 34 at 17-18 (citing *Globus v. Law. Res. Serv., Inc.*, 418 F.2d 1276, 1288 (2d Cir. 1969)).

- *Second*, the Opt-Out Plaintiffs argued that the injunction rendered their opt-out rights "illusory with respect to the Mutual Fund, TAP, and U.S. Bank's agents." ECF 34 at 21.

- *Third*, the Opt-Out Plaintiffs argued that the injunction "effectively" removed their claims to federal court in violation of the anti-removal provision of the Securities Act of 1933. ECF 34 at 22.

- *Fourth*, the Opt-Out Plaintiffs argued that the injunction violated the Anti-Injunction Act, 28 U.S.C. § 2283.

Before the Opt-Out Plaintiffs' motion to intervene was fully briefed, however, the SEC, TAP, and the Opt-Out Plaintiffs negotiated an amendment to the litigation injunction. *See* ECF 36. On March 10, 2023, the Court entered the March Order, confirming this Court's exclusive jurisdiction over the Special Reserve while narrowing the litigation stay. ECF 38. This narrower version of the stay permitted litigation to proceed against Quasar and civil discovery to proceed against the officers and trustees. March Order ¶ 12.[11]  The March Order also authorized the SEC or the Special Master to:

> move this Court on notice to the affected parties and for good cause shown to have the stay of litigation in this Order extend to the Mediated Securities Class Actions, the *Rowan* Action, and actions against non-natural persons based exclusively on

---

[11] In a footnote, the March Order clarified that "the Opt-Out Plaintiffs' Securities Act claims against U.S. Bancorp Fund Services, LLC, Quasar Distributors, LLC, EisnerAmper LLP, Infinity Q Capital Management LLC, James Velissaris, Leonard Potter, Scott Lindell, Bonderman Family Limited Partnership, LP, and Infinity Q Management Equity LLC are not stayed by this Order, and nothing herein prohibits the Opt-Out Actions from proceeding against those non-natural persons. Further, nothing herein prohibits the Opt-Out Plaintiffs from obtaining civil discovery in the Opt-Out Actions from the Trust, the Fund, John C. Chrystal, Albert J. DiUlio, S.J., Christopher E. Kashmerick, Harry E. Resis, Russell B. Simon or Steven J. Jensen to the extent civil discovery is authorized by applicable federal and state statutes and rules of procedure." March Order at 12 n.1.

the Securities Act, to protect the Fund and to establish the appropriate Special Reserve to effect a final distribution to the Fund's shareholders.

*Id.* ¶ 12(B)(i).

On May 26, 2023, the Opt-Out Plaintiffs filed an amended complaint (the "Amended Opt-Out Complaint") in New York Supreme Court asserting claims under Sections 11, 12(a)(2), and 15 of the Securities Act. *See Glenmede Trust Co. v. Infinity Q Cap. Management LLC*, No. 160830/2022, (N.Y. Sup. Ct. Comm'l Div.), Doc. No. 101.[12] The Amended Opt-Out Complaint asserts the following claims against the following defendants:

- **Section 11 claim** against James Velissaris, Leonard Potter, Scott Lindell, John C. Chrystal, Albert J. DiUlio, S.J., Christopher E. Kashmerick, Harry E. Resis, Russell B. Simon, and Steven J. Jensen (collectively, the "Individual Defendants"), TAP, IQCM, Quasar, USBFS, and EisnerAmper;

- **Section 12(a)(2) claim** against TAP, IQCM, Quasar, and USBFS; and

- **Section 15 claim** against IQCM, the Individual Defendants, USBFS, and Bonderman Family Limited Partnership, LP.

Following the New York Supreme Court's dismissal of certain of their claims[13], the Opt-Out Plaintiffs are left with the following claims against TAP, Quasar, and certain of the trustees

---

[12] The other two state court actions filed amended complaints containing nearly identical allegations. The Parties stipulated, and the court ordered, that the *Glenmede* action would be considered the lead Opt-Out case and that "[a]ll filings relating to the Motions to Dismiss, and all related rulings of the Court, filed and/or entered in the *Glenmede* Case shall apply equally to [*Carson* and *Flint Hills*] as though filed and/or entered therein." *Carson Family 2013 Dynasty Trust, et al. v. Infinity Q Cap. Mgmt. LLC, et al.*, No. 160834/2022 (N.Y. Sup. Ct. Comm'l Div.), Doc. No. 42; *Flint Hills Diversified Strategies L.P., et al. v. Infinity Q Cap. Mgmt. LLC, et al.*, No. 160964/2022 (N.Y. Sup. Ct. Comm'l Div.), Doc. No. 40.

[13] Specifically, the state court has dismissed the Opt-Out Plaintiffs' Section 11 claims against IQCM, USBFS, Lindell, and Potter; their Section 12 claims against IQCM and USBFS; and the Section 15 claims against IQCM, USBFS (to the extent the claim was based on control over Quasar), Bonderman Family Limited Partnership, LP, Lindell, and Potter. *See Glenmede Trust Co. v. Infinity Q Cap. Management LLC*, No. 160830/2022, (N.Y. Sup. Ct. N.Y. Cnty.) Doc. Nos. 199, 203, 205, 208, 209. Pursuant to the so-ordered stipulations, these decisions applied to the *Carson* and *Flint Hills* cases as well. The state court has not yet ruled on a motion to dismiss by Velissaris.

and officers: Chrystal, DiUlio, Resis, Kashmerick, Simon, and Jensen (the "Remaining Individual

Defendants"):

- **Section 11 claims against TAP, Quasar, and the Remaining Individual Defendants.** These claims are predicated on allegations that the Trust's securities filings in December 2019, including its prospectus, contained false statements of material fact and/or omitted material facts that were required to be disclosed or necessary to make the statements therein not misleading. *See* Amended Opt-Out Complaint ¶ 270. These Section 11 claims are governed by different standards: As an issuer or as signatories of the filings, TAP and the Remaining Individual Defendants other than Jensen are subject to a strict-liability standard, while Quasar, as the underwriter, and Jensen, as a non-signatory officer, may only be held liable if the Opt-Out Plaintiffs establish their negligence. *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 435 n.10 (S.D.N.Y. 2009);

- **Section 12 claims against TAP and Quasar based on their offers to sell, solicitations to sell, and/or sales of shares of the Fund by means of the Trust's securities filings in December 2019.** *See* Amended Opt-Out Complaint ¶ 285. These claims are governed by the negligence standard as the Amended Opt-Out Complaint does not allege fraud. Amended Opt-Out Complaint ¶ 284; *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 435 n.10 (S.D.N.Y. 2009); and

- **Section 15 claims against the Remaining Individual Defendants based on their alleged status as control persons of the Fund, TAP, USBFS, or Quasar by virtue of their management positions with USBFS and/or TAP.** *See* Amended Opt-Out Complaint ¶ 296. Section 15 claims do not require a finding of scienter. *See In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011) ("[T]o establish § 15 liability, a plaintiff must show a 'primary violation' of § 11 [or § 12(a)(2)] and control of the primary violator by defendants.").

### D.    The Stipulated Stay and its Termination

On May 29, 2024, this Court so-ordered a stipulation between the Special Master, the SEC,

the Fund, Quasar, USBFS, and the Opt-Out Plaintiffs temporarily staying the Opt-Out Plaintiffs'

litigation (the "Stipulation"). ECF 97. Pursuant to the Stipulation, "The Opt-Out Actions against

USBFS and Quasar [were] stayed until 7 days after written notice filed by the Opt-Out Plaintiffs

with this Court, which notice shall not be given before July 9, 2024, or upon further order of this

Court." *Id.* ¶ 1.

On July 10, 2024, the Opt-Out Plaintiffs filed a notice terminating the stay against USBFS and Quasar. ECF 103. Pursuant to the Stipulation, the stay lifted on July 17, 2024. The March Order, which stays all claims against the Fund, TAP, and the other Indemnitees, remains in effect.

### E.    The Fund's Special Reserve

As of June 30, 2024, the balance of the Special Reserve was $99,180,238. *See* Special Master's Fifth Quarterly Report, ECF 104 at 1. This sum includes Fund assets that the Special Master set aside, with this Court's approval, to pay legal costs of the Fund and the Indemnitees in pending litigations before distributing the remainder to the Fund's shareholders. As of July 2024, the Fund has paid approximately $9,857,830.66 in total for attorneys' fees and costs for the Fund, TAP, and the Indemnitees, of which $7,796,796.47 was for expenses associated with claims against the Fund and/or TAP and $2,061,034.19 was for expenses associated with claims against the Indemnitees.[14] At present, the Opt-Out Plaintiffs' litigations are ramping up and discovery is beginning in earnest. As a result, the associated litigation costs are expected to increase significantly in the near future.

### DISCUSSION

The March Order authorizes the Special Master to "move this Court on notice to the affected parties and for good cause shown to have the stay of litigation in this Order extend to . . . actions against non-natural persons based exclusively on the Securities Act[] to protect the Fund and to establish the appropriate Special Reserve to effect a final distribution to the Fund's shareholders." March Order ¶ 12(B)(i).  For the reasons set forth below, all claims against the

---

[14] An additional $7,164,472.98 in claimed attorneys' fees and costs has been sought as advancement. Of this sum, $4,400,000.00 has been the subject of claims filed with the Fund's insurer; and payment of legal fees and costs in the amount of $2,708,797.48 has been deferred because certain of the Indemnitees have not qualified for advancement.

Fund, TAP, and the Indemnitees should now be permanently enjoined for "good cause" under the March Order and pursuant to the All Writs Act.

I.    **THIS COURT SHOULD PERMANENTLY ENJOIN ALL CLAIMS AGAINST THE FUND, TAP, AND THE INDEMNITEES**

As contemplated in the March Order, this Court should exercise its authority under the All Writs Act to permanently enjoin the Opt-Out Plaintiffs' action and all other claims against the Fund, TAP, and the Indemnitees in order to preserve its exclusive jurisdiction over the Special Reserve and to prevent the Special Reserve from being further depleted by the Fund's advancement and indemnification obligations. Further, permanent injunctive relief is the only way to ensure a prompt and equitable *pro rata* distribution of assets to all the Fund's shareholders.

A.    **This Court Has Broad Authority Under the All Writs Act to Issue an Injunction to Protect its Jurisdiction and to Effectuate a Plan of Distribution**

Ordinarily, a federal court is barred from enjoining a state court action by the Anti-Injunction Act, which provides that federal courts may not enjoin actions in state court unless the injunction falls within one of three enumerated categories, including, "where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. But where, as here, "a court's injunction [is] in fact necessary in aid of its jurisdiction . . . the injunction [is] authorized by the All Writs Act, and [is] not barred by the Anti-Injunction Act." *Rsrv. Fund*, 673 F. Supp. 2d at 204 (citation and internal quotation marks omitted). District courts enjoy broad discretion to issue injunctions in aid of their jurisdiction, and such injunctions are reviewed deferentially only for abuse of discretion. *See United States v. Schurkman*, 728 F.3d 129, 135 (2d Cir. 2013).

The All Writs Act authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law," 28 U.S.C. § 1651(a), including a litigation injunction to maintain their exclusive jurisdiction over a limited *res*, even where such an injunction may impair the claims of non-parties. *See Rsrv. Fund*, 673 F.

Supp. 2d at 202 ("The Second Circuit has noted that an All Writs Act injunction is appropriate in cases where 'federal courts have jurisdiction over a res in an in rem action,' because the exercise of jurisdiction over the same res by state courts would necessarily impair the jurisdiction of the federal court." (quoting *In re Baldwin-United Corp.*, 770 F.2d 328, 336 (2d Cir. 1985)); *see also Stott v. Cap. Fin. Servs., Inc.*, 277 F.R.D. 316, 337 (N.D. Tex. 2011) ("In approving a 'limited fund' settlement, courts are frequently forced to enjoin competing litigation in order to preserve the 'limited fund' utilizing their authority under the All Writs Act.").

Injunctions under the All Writs Act are not subject to the traditional four-part showing required by Rule 65 of the Federal Rules of Civil Procedure. *See Baldwin-United*, 770 F.2d at 339 ("Rule 65 does not apply to injunctions issued under the All Writs Act against non-parties whose actions would impair the court's jurisdiction."); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2014 WL 4966072, at *32 (E.D.N.Y. Oct. 3, 2014) ("[A] court's authority to issue an injunction under the [All Writs] Act is not limited by Rule 65."). Rather, under the All Writs Act, a more lenient standard applies: the injunction need only "be specific and definite enough to apprise those within its scope of the conduct that is being proscribed" and "those subject to the injunction [must] receive appropriate notice of its terms." *Baldwin-United*, 770 F.2d at 339.

### B. Permanent Injunctive Relief is Necessary to Protect this Court's Jurisdiction Over the Special Reserve and to Prevent the Dissipation of Fund Assets

Where, as here, a federal court is tasked with preserving the assets of a limited *res* for distribution, the issuance of an injunction under the All Writs Act addresses two intertwined concerns: (i) protecting the exclusive jurisdiction of the federal court to ensure that it has unimpeded authority to effect a final plan of distribution; and (ii) preserving the corpus of the *res* from dissipation by preventing courts in ancillary state proceedings from issuing competing orders directing the distribution of the limited assets of the *res*. Both interests are implicated here.

*First*, as this Court and the Second Circuit have clearly held, an All Writs Act injunction is appropriate in cases involving the distribution of a limited *res* because the exercise of jurisdiction over the same *res* by state courts would necessarily impair the jurisdiction of the federal court. *See Baldwin-United*, 770 F.2d at 336 (noting that where "federal courts have jurisdiction over a *res* in an *in rem* action . . . the exercise by the state court of jurisdiction over the same *res* necessarily impairs, and may defeat, the jurisdiction of the federal court already attached" (internal quotation marks omitted)); *Rsrv. Fund*, 673 F. Supp. 2d at 204 ("The distribution plan that this Court has determined is necessary for the fair and equitable treatment of all claimants simply cannot succeed if suits brought in state court are allowed to proceed, depleting the *res* and interfering with the equitable principles underlying the *pro rata* distribution.").

Here, there is no question that the Special Reserve is a limited *res*: the liquidation of the Fund resulted in a shortfall of approximately half a billion dollars, and even under the Special Master's most optimistic predictions, the anticipated recovery on the Fund's claims against EisnerAmper, USBFS, and others is unlikely to close the gap. Nor is there any dispute that this Court enjoys exclusive jurisdiction over the Special Reserve and "all matters arising out of, and related to, the Special Reserve." March Order ¶ 1. This Court's orders contemplate a distribution process for the Special Reserve to be proposed and managed by the Special Master, subject to this Court's approval and oversight. *See* March Order ¶ 2(B).  But without the requested permanent injunction, the orderly distribution of the Special Reserve could be undermined by competing or inconsistent orders issued by courts in Ancillary Proceedings.

*Second*, immediate and permanent injunctive relief is needed here to prevent further dissipation of the Special Reserve. To date, the Special Master has distributed all but the roughly $100 million remaining Special Reserve to the shareholders on a *pro rata* basis, with the remaining

amount set aside principally to cover the legal costs and potential judgments against the Fund and its Indemnitees, particularly in the Opt-Out Plaintiffs' action, and to pursue claims on behalf of the Fund. Other than interest income earned by the Special Reserve, the Fund does not have assets beyond the Special Reserve, and any claim allowed to proceed against the Fund, TAP, or the Indemnitees would deplete the Special Reserve, diminishing shareholder recovery.

Without a permanent injunction, the state court actions will require the Fund to draw against the Special Reserve to pay its own legal fees and those of TAP; to advance legal fees and potentially to indemnify Quasar; and to indemnify the trustees and officers. The Fund's advancement obligation to Quasar is broader than its indemnification obligation; advancement must be paid immediately upon demand to *potential* indemnitees, regardless of the ultimate merits of the plaintiff's claims or the indemnitee's defenses. *See In re Platinum-Beechwood Litig.*, 378 F. Supp. 3d 318, 330 (S.D.N.Y. 2019) ("advancement 'is a right whereby a *potential* indemnitee has the ability to force the [indemnitor] to pay his litigation expenses as they are incurred regardless of whether he will ultimately be entitled to indemnification.'" (emphasis and alterations in original) (citations omitted)). In short, without permanent injunctive relief barring the Opt-Out Plaintiffs from proceeding against the Fund, TAP, and the Indemnitees, the assets of the Special Reserve will be depleted by the substantial anticipated attorneys' fees and costs instead of being returned to the defrauded shareholders.

In *Reserve Fund*, Judge Gardephe found that potential interference with the federal court's distribution plan and possible depletion of assets from the limited *res* available justified the issuance of an All Writs Act injunction, explaining:

> A state court adjudicating claims against the . . . Fund, or claims against the Defendants for indemnifiable conduct for which the . . . Fund would be liable, would be exercising jurisdiction over that same res. A state court could grant relief to an individual claimant and siphon assets away from the res without regard to any

> equitable concerns, thereby undermining the implementation of the pro rata distribution this Court has deemed necessary to treat all claimants fairly and equitably. As the Second Circuit outlined in *Baldwin-United*, this kind of inherent conflict justifies the issuance of an All Writs Act injunction.

673 F. Supp. 2d at 203. Those same concerns are present here. Enjoining other claims against the Fund, TAP, and the Indemnitees is thus "appropriate or necessary" equitable relief that this Court is authorized to grant under the All Writs Act in aid of this Court's jurisdiction over the Special Reserve. 28 U.S.C. § 1651(a); *Rsrv. Fund*, 673 F. Supp. 2d at 202.

### C. Injunctive Relief is Necessary to Ensure that Similarly Situated Shareholders are Treated Equitably

Subject to the Court's approval, the Special Master contemplates a final distribution that will settle all approved expenses and distribute—like previous court-approved distributions—all remaining funds to all of the Fund's shareholders on a *pro rata* basis, thus treating all shareholders alike. The Special Master respectfully submits that a *pro rata* distribution is consistent with controlling case law, prior distributions in this case, and is the most equitable approach. A fair *pro rata* distribution, however, cannot be achieved without the requested permanent injunction.

Where, as here, "investors' assets are commingled and the recoverable assets . . . are insufficient to repay the investors, equality is equity." *SEC v. McGinn, Smith & Co.*, 2016 WL 6459795, at *3 (N.D.N.Y. Oct. 31, 2016) (quoting *S.E.C. v. Wealth Mgmt. LLC*, 628 F.3d 323, 327 (7th Cir. 2010)) (internal quotations omitted). "In particular, pro rata distributions are proper 'where the funds of the defrauded victims [ar]e commingled and where victims [ar]e similarly situated with respect to their relationship to the defrauders.'" *McGinn, Smith & Co.*, 2016 WL 6459795, at *3 (quoting *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88-89 (2d Cir. 2002)) (alterations in original). And *pro rata* distribution is particularly appropriate for the remaining assets of a mutual fund: by law, mutual fund shares are "redeemable securities" entitling holders to their "proportionate share of the issuer's current net assets, or the cash equivalent thereof." 15

U.S.C. § 80a-2(a)(32).  To achieve this, a mutual fund must calculate its net asset value on a daily basis and must redeem all shares on a given day at the same price per share. *See* 17 C.F.R. § 270.22c-1(a) ("No registered investment company issuing any redeemable security . . . shall sell, redeem, or repurchase any such security except at a price based on the current net asset value of such security . . . .").

These principles apply here because shareholders' funds were comingled and the assets of the Special Reserve are insufficient to repay these shareholders. All of the shareholders are similarly situated with respect to their relationship to "the defrauder," Velissaris: none were aware that Velissaris was engaging in the fraudulent inflation of the Fund's net asset value.  As such, the Fund's shareholders are each equally entitled to an equitable recovery proportional to the amount of their investment. Here, as in *McGinn*, "equality is equity." 2016 WL 6459795, at *3.

But a *pro rata* distribution of the Special Reserve cannot be achieved without a permanent injunction. Any judgment obtained in litigation against the Indemnitees is tantamount to a judgment against the Fund itself because the Fund, as indemnitor, is the obligor of any such the judgment. Such a judgment would cannibalize the Special Reserve, transforming the remaining assets of the Fund to which all shareholders have an equally valid claim into a pot of damages for the Opt-Out Plaintiffs alone, and frustrating a *pro rata* distribution of the remaining assets of the Fund. If, on the other hand, the Opt-Out Plaintiffs were to proceed with their claims and lose, all shareholders would share *pro rata* in the costs to the Fund associated with that loss. Neither outcome is equitable.

To avoid these inevitably inequitable results, the Special Master respectfully requests that the Court permanently enjoin all current and future claims, including the Opt-Out Plaintiffs' claims, against the Fund, TAP, and the Indemnitees.

## II.    THE OPT-OUT PLAINTIFFS' OBJECTIONS ARE WITHOUT MERIT

In support of their prior motion to intervene in this action, the Opt-Out Plaintiffs raised four challenges to this Court's authority to stay their state-court claims: (i) the Indemnitees' contractual right to indemnification may ultimately be deemed unenforceable on public policy grounds; (ii) a stay enjoining litigation of their claims in state court would render their due process right to opt out of class settlement "illusory"; (iii) an injunction would impermissibly "remove" their state court securities action to federal court; and (iv) a stay enjoining litigation of their claims in state court would violate the Anti-Injunction Act. ECF 23, 34. These arguments have no merit.

### A.    Allowing Claims Against the Indemnitees to Advance Will Deplete the Special Reserve and Delay Distribution of the Special Reserve

The Opt-Out Plaintiffs first argue that the Indemnitees' contractual right to indemnification may ultimately be deemed unenforceable on public policy grounds. ECF 34 at 18-19. This argument fails for multiple reasons.

As a threshold matter, the Opt-Out Plaintiffs fail to acknowledge the Fund's advancement obligation to Quasar, which will *immediately* deplete the Special Reserve, regardless of whether the indemnification provision of the Distribution Agreement is ultimately deemed unenforceable. *See In re Platinum-Beechwood Litig.*, 378 F. Supp. 3d at 330 (advancement "is a right whereby a *potential* indemnitee has the ability to force the [indemnitor] to pay his litigation expenses *as they are incurred regardless of whether he will ultimately be entitled to indemnification*." (emphasis added) (internal quotation marks omitted)).

Even setting aside the Fund's *advancement* obligations to Quasar, the Opt-Out Plaintiffs' assertion that the Fund may ultimately be relieved of its *indemnification* obligations is not supported by the law or the facts.  As a general matter, it is well settled that corporate entities may indemnify directors and officers for ordinary negligence or strict liability. *See Wisener v. Air Exp.*

*Int'l Corp.*, 583 F.2d 579, 581 (2d Cir. 1978) ("There is little doubt that a corporation may commit itself to indemnify its officers and directors for litigation expenses incurred in defending against liability for actions taken in carrying out corporate responsibilities, even though negligent, if the corporation finds it in the corporate interest to undertake such a commitment."). And the Investment Company Act of 1940, which governs the Fund, prohibits indemnifying directors, officers, and underwriters only for acts of "willful misfeasance, bad faith, gross negligence or reckless disregard . . . ." 15 U.S.C. § 80a-17(h), (i).

Here, none of the Opt-Out Plaintiffs' three surviving causes of action will require a finding of anything more than mere negligence. Specifically:

- The Section 11 claims are governed by the strict-liability standard for the signatory-defendants (TAP and the Remaining Individual Defendants other than Jensen) and the ordinary negligence standard for the non-signatory defendants (Quasar and Jensen);

- The Section 12 claims against TAP and Quasar are governed by the ordinary negligence standard; and

- The Section 15 claims do not require a finding of scienter. *See In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011) ("[T]o establish § 15 liability, a plaintiff must show a 'primary violation' of § 11 [or § 12(a)(2)] and control of the primary violator by defendants.").

Moreover, it is unlikely the Opt-Out Plaintiffs could adduce sufficient facts to demonstrate scienter on the part of Quasar given that their complaint simply lumps Quasar in with several other entities and makes only generalized, broad-brush allegations about them collectively. And as the Opt-Out Plaintiffs' own authority demonstrates, should the Indemnitees prevail, or at least demonstrate that they are not at fault, there would "be no basis in statute or case law to support an argument that [their] indemnification agreements are unenforceable." *Credit Suisse First Bos., LLC v. Intershop Commc'ns AG*, 407 F. Supp. 2d 541, 549 (S.D.N.Y. 2006).

The Opt-Out Plaintiffs' contrary arguments have no merit. Regulation S-K—which requires issuers to include a statement in the prospectus that, in the SEC's view, provisions indemnifying *directors and officers*[15] for violations of the Securities Act of 1933 should be deemed unenforceable on public policy grounds—does not displace the indemnification provisions of the Investment Company Act, which permit indemnification in the absence of "willful misfeasance, bad faith, gross negligence or reckless disregard . . . ." 15 U.S.C. § 80a-17(h), (i). And *Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1288 (2d Cir. 1969), on which the Opt-Out Plaintiffs rely, is inapposite. There, the party seeking indemnification had *actual knowledge* of the misconduct alleged. In affirming the district court's invalidation of the indemnification provision at issue, the Court expressly limited its holding to "the case where the underwriter has committed a sin graver than ordinary negligence." *Id.* Thus, to the extent the SEC's statement of policy in 17 C.F.R. § 229.510 would invalidate indemnification provisions that cover negligent or innocent conduct under the Securities Act, it is inconsistent with the Investment Company Act and goes much further than the Second Circuit's holding in *Globus*.

In any event, even in the speculative circumstances posited by the Opt-Out Plaintiffs, shareholder recovery will be delayed—likely for several years—until the Opt-Out Plaintiffs' claims are finally adjudicated and the indemnification issue is litigated. Until such potential claims against the Special Reserve are determined, no distributions can be made to the Fund's shareholders. Thus, allowing the Opt-Out Plaintiffs' claims to proceed against the Indemnitees will have a direct and immediate impact on this Court's jurisdiction and on the prompt and ratable liquidation of the Special Reserve.

---

[15] There is no comparable provision for underwriters. *Compare* 17 C.F.R. § 229.510 *with* 17 C.F.R. § 229.508(g).

**B.      Permanent Injunctive Relief Does Not Violate the Opt-Out Plaintiffs' Due Process Rights**

The Opt-Out Plaintiffs argue that a stay enjoining litigation of their claims in state court would render their opt-out rights illusory, in violation of their due process right to "pursue claims outside of the class" against Mutual Fund, TAP, and "U.S. Bank's agents" (presumably meaning Quasar). ECF 34 at 21. Not so.

As a practical matter, the proposed injunction will not prevent the Opt-Out Plaintiffs from pursuing litigation against any third-party provider to the Fund that is not an Indemnitee. Unlike the settling shareholders, the Opt-Out Plaintiffs can still pursue claims against USBFS and EisnerAmper for damages under the requested injunction because neither the legal fees incurred by those defendants nor the issuance of any judgment against them would impinge upon this Court's jurisdiction by draining the Special Reserve.

More fundamentally, the due process problem about which the Opt-Out Plaintiffs complain simply does not exist. As the Opt-Out Plaintiffs correctly note, "due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class" by opting out. *Phillips Petro. Co. v. Shutts*, 472 U.S. 797, 812 (1985). While the due process clause protects a plaintiff's *right* to prosecute its claims on its own behalf, it does not guarantee that the plaintiff will be *able* to do so as a practical matter. To take an example from the bankruptcy context, a plaintiff who is stymied in his efforts to pursue a cause of action by the bankruptcy of a defendant and the imposition of the automatic bankruptcy stay has not suffered a due process violation. *Fidelity Mort. Inv. v. Camelia Builders, Inc.*, 550 F.2d 47, 55 (2d Cir. 1976) (construing former Bankruptcy Act). Rather, "[d]ue process is satisfied because creditors have an opportunity to obtain relief from the automatic stay in the bankruptcy court." *Petition of Singer*, 205 B.R. 355, 357 (S.D.N.Y. 1997) (discussing *Fidelity Mortgage Investors*). Policy considerations played an

important role in the Second Circuit's determination that the imposition of the automatic bankruptcy stay does not result in a due process violation for creditors. *Fidelity Mortgage* held that the automatic stay:

> is designed to prevent a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts. The stay insures that the debtor's affairs will be centralized, initially, in a single forum in order to prevent conflicting judgments from different courts and in order to harmonize all of the creditors' interests with one another.

*Fidelity Mort. Inv.*, 550 F.2d at 55.

The principles apply here. There is no dispute that the Opt-Out Plaintiffs were afforded—and exercised—their due process right to opt out of having their claims extinguished by the settlement of the class action. Nor is there any dispute that the Opt-Out Plaintiffs received notice of the instant Application or that they will be afforded an opportunity to be heard before the requested injunction is imposed. That is all that due process requires. *See id.* (holding that the automatic bankruptcy stay does not violate due process because it provides for a prompt hearing at which creditors may seek relief from the stay). And the important policy goals of preventing the dissipation of assets and facilitating an orderly and *pro rata* distribution are equally salient here.

To be sure, "[a]n equitable plan is not necessarily a plan that everyone will like." *Rsrv. Fund*, 673 F. Supp. 2d at 195 (quoting *SEC v. Byers*, 637 F. Supp. 2d 166, 168 (S.D.N.Y.2009)). Indeed, "when funds are limited, hard choices must be made." *Rsrv. Fund*, 673 F. Supp. 2d 182 at 195 (quoting *Off. Comm. of Unsecured Creditors of WorldCom, Inc. v. S.E.C.*, 467 F.3d 73, 84 (2d Cir. 2006)). Courts in this Circuit routinely make the choice to issue injunctions under the All Writs Act to protect their jurisdiction and to effectuate an orderly and ratable liquidation of a limited fund. In this case, the Court's Orders provide that the hard choices are to be made by the Special Master, subject to the approval and oversight of this Court. At bottom, the Opt-Out Plaintiffs' due process argument is an attempt to wrest control of the Special Reserve from the

Court and the Special Master. But this argument is wrong on the law and on the equities. The proposed injunction does not violate due process.

### C.    The Proposed Injunction Would Not "Effectively Remove" the Opt-Out Plaintiffs' Claims to Federal Court

The Opt-Out Plaintiffs next argue that a stay enjoining litigation of their claims in state court would effectively and impermissibly remove their claims to federal court. ECF 34 at 22. Because they asserted claims under the Securities Act of 1933 in state court, the Opt-Out Plaintiffs argue, and because cases brought in state court under the 1933 Act may not be removed to federal court pursuant to 15 U.S.C. § 77v(a), this Court may not do anything to impede the Opt-Out Plaintiffs' state court actions. This argument misses the mark.

The requested injunctive relief would not remove the Opt-Out Plaintiffs' state-court claims to federal court or otherwise adjudicate those claims in a federal forum. Rather, the proposed injunction would enjoin their state-court claims as against the Fund, TAP, and the Indemnitees in order to protect this Court's jurisdiction and the Special Reserve. Nevertheless, the Opt-Out Plaintiffs will remain free to continue litigating their claims against USBFS and EisnerAmper and all of the other defendants they have named *in state court*. As such, the Opt-Out Plaintiffs have no cause for concern that their claims will be removed and adjudicated in federal court.

### D.    The Anti-Injunction Act is Inapplicable Here

Lastly, the Opt-Out Plaintiffs argue that the Anti-Injunction Act, 28 U.S.C. § 2283, precludes this Court from enjoining the state court actions. ECF 34 at 22. It does not, and this argument has been rejected where, as here, the dispute concerns a limited amount of funds subject to the jurisdiction of the federal court. When "a court's injunction [is] in fact necessary in aid of its jurisdiction . . . the injunction [is] authorized by the All Writs Act, and [is] not barred by the Anti-Injunction Act." *Rsrv. Fund*, 673 F. Supp. 2d at 204 (citation and internal quotation marks

omitted). Here, the requested injunctive relief is in aid of this Court's exclusive jurisdiction over the Special Reserve, will prevent the depletion of the Special Reserve—a limited *res*—and is necessary for the implementation of a prompt, *pro rata* distribution. *See supra*, Section I.A.

The Opt-Out Plaintiffs attempt to argue otherwise by asserting that "the Anti-Injunction Act does not permit a federal court to protect its jurisdiction by enjoining a state-court *in personam* action and noting that the state court actions are *in personam* proceedings, and not *in rem* proceedings. ECF 34 at 24. However, where the *federal* action concerns the disposition of a limited *res*—regardless of whether it was "brought *in rem*"—Courts in this Circuit routinely enjoin state court *in personam* actions to avoid depleting the assets of the *res*. *See In re Baldwin-United Corp.*, 770 F.2d at 336 (enjoining state court actions where federal court exercised jurisdiction over a *res* in an *in rem* action; "in such a case, because the exercise by the state court of jurisdiction over the same *res* necessarily impairs, and may defeat, the jurisdiction of the federal court already attached, the federal court is empowered to enjoin any state court proceeding affecting that *res*" (internal quotation marks omitted)); *Rsrv. Fund*, 673 F. Supp. 2d at 204 (granting All Writs Act Injunction in aid of jurisdiction where federal court was "dealing with a limited res that [was] likely to be dissipated" by claims against the fund or that would implicate fund's indemnification obligations in the absence of an injunction).

The Opt-Out Plaintiffs fare no better with the argument that their *in personam* claims do not "seek a judgment against, or to interfere with, the Special Reserve." ECF 34 at 25. Regardless of what the Opt-Out Plaintiffs *seek* to do, the inevitable consequences of allowing their state court actions to proceed would be the depletion of the Special Reserve, interference with this Court's exclusive jurisdiction over the Special Reserve, and the frustration of an equitable distribution. *See supra*, Section I.

Finally, the Opt-Out Plaintiffs claim that the *Glenmede* action should have priority over this one, as *Glenmede* was filed a few weeks prior to the issuance of this Court's January Order. *Id.* In support, the Opt-Out Plaintiffs rely on *Kline v. Burke Const. Co.*, 260 U.S. 226, 229 (1922), which explained that where the *in rem* jurisdiction "of the state court has first attached, the federal court is precluded from exercising its jurisdiction over the same *res* to defeat or impair the state court's jurisdiction." But the state court in the Opt-Out Actions has no *res* before it, ECF 34 at 24, and priority is a non-issue here.

## **CONCLUSION**

For the foregoing reasons, the Special Master respectfully requests that the Court issue the Proposed Order to Show Cause and grant the Application for Injunctive Relief permanently enjoining all actions against the Fund, TAP, and the Indemnitees.

Dated:  New York, New York                     Respectfully submitted,
            August 9, 2024

                                                              /s/ Daniel S. Noble
                                                              Daniel S. Noble
                                                              KRIEGER LEWIN LLP
                                                              350 Fifth Avenue, 77th Floor
                                                              New York, NY 10118
                                                              Tel: (212) 390-9555
                                                              Email: daniel.noble@kriegerlewin.com

                                                              FINN DIXON & HERLING LLP
                                                              Benjamin M. Arrow
                                                              Eli Yampel
                                                              Six Landmark Square
                                                              Stamford, CT 06901
                                                              Tel: (203) 325-5080
                                                              barrow@fdh.com
                                                              eyampel@fdh.com

                                                              *Attorneys for the Special Master*