UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                :

   SECURITIES AND EXCHANGE COMMISSION,   :   No. 22 Civ. 09608 (PKC)

                                :

               Plaintiff,                :

                                :

                   v.                 :

                                :

   INFINITY Q DIVERSIFIED ALPHA FUND,       :

                                :

              Defendant.             :

                                :

------------------------------------------------------------------x

---

## MUTUAL FUND OPT-OUT PLAINTIFFS' OBJECTION
## TO THE SPECIAL MASTER'S PROPOSED INJUNCTION

---

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT .................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................... 4

   I.     The Collapse of the Infinity Q Mutual Fund ....................................... 4

   II.    The Class Settlement and the "Consented To" Litigation Stay ............................. 5

   III.   The Special Master Seeks the Proposed Injunction................................. 8

ARGUMENT ................................................................................................................ 8

   I.     The Special Master Overstates the Court's Jurisdiction and Authority to Enjoin State Court Proceedings ................................................. 8

        A.    The Court's Jurisdiction Is Narrowly Limited to the Special Reserve ....... 8

        B.    The All Writs Act Must Be Construed Narrowly in Furtherance of the Court's Already Limited Jurisdiction ...................................... 10

             1.    The All Writs Act Must Be Construed in Favor of the State Actions ........................................................... 10

             2.    The Aid-of-Jurisdiction Exception Applies Only to Conflicting *In Rem* Jurisdiction.......................................... 11

             3.    Baldwin–United and Reserve Fund Do Not Control Here .......... 12

   II.    The Proposed Injunction Is Not Necessary to Aid the Court's Jurisdiction ........ 15

        A.    Mere Uncertainty, Inconvenience, or Delay Does Not Justify the Proposed Injunction ................................................. 16

        B.    Quasar's Indemnity Claim Does Not Justify the Proposed Injunction ..... 18

             1.    The Special Master Does Not Establish that Quasar's Indemnity Claim Would be Collectable from the Special Reserve................ 18

             2.    The Special Master Does Not Establish that Quasar's Indemnity Claim Would be Viable in The First Place ................................... 19

                 a.    There Are Serious Doubts About the Viability of Quasar's Indemnity Claim Under the Relevant Contract ................ 19

i

b.    There Are Serious Doubts About the Enforceability of Quasar's Indemnity Claim Under Public Policy .............. 20

C.    Limited Discovery from the Stayed Parties Does Not Justify the Proposed Injunction ................................................................... 22

III.    The Proposed Injunction Violates Due Process ..................................... 23

A.    The Proposed Injunction Abridges the Due Process Protections Underpinning the Class Settlement ........................................... 23

B.    The Special Master Lacks Roving Authority to Pick Winners and Losers ........................................................................................ 25

CONCLUSION ......................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

**Cases**

*Am. Transit Ins. Co. v. Pierre*,
    2024 WL 2214525 (E.D.N.Y. May 16, 2024)................................................... 13, 19

*Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*,
    398 U.S. 281 (1970) .............................................................................. 11, 16, 17

*Brink's Glob. Servs. USA, Inc. v. Midwest Goldbuyers, Inc.*,
    2017 WL 6887593 (S.D.N.Y. Dec. 12, 2017).................................................. 13, 16

*Credit Suisse First Bos., LLC v. Intershop Commc'ns AG*,
    407 F. Supp. 2d 541 (S.D.N.Y. 2006) ...................................................................... 21

*Garcia v. Hatchet Works Corp.*,
    659 B.R. 626 (E.D.N.Y. 2024) ................................................................................ 19

*Globus v. Law Rsch. Serv., Inc.*,
    418 F.2d 1276 (2d Cir. 1969)................................................................................... 21

*Gov't Emps. Ins. Co. v. Granovsky*,
    2022 WL 1810727 (E.D.N.Y. June 2, 2022)....................................... 11, 13, 14, 18

*Hecht v. United Collection Bureau, Inc.*,
    691 F.3d 218 (2d Cir. 2012).................................................................................... 23

*In re Agent Orange Prod. Liab. Litig.*,
    597 F. Supp. 740 (E.D.N.Y. 1984).......................................................................... 24

*In re Baldwin-United Corp.*,
    607 F. Supp. 1312 (S.D.N.Y. 1985)........................................................................ 25

*In re Baldwin-United Corp.*,
    770 F.2d 328 (2d Cir. 1985).................................................................................... 12

*In re Colt Indus. S'holder Litig.*,
    77 N.Y.2d 185 (1991) ............................................................................................. 23

*In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*,
    99 F. Supp. 3d 288 (E.D.N.Y. 2015)................................................................. 13, 15

*In re Roman Cath. Diocese of Rockville Ctr., New York*,
    651 B.R. 622 (Bankr. S.D.N.Y. 2023) .................................................................... 19

*In re The Reserve Fund Sec. & Derivative Litig.*,
    673 F. Supp. 2d 182 (S.D.N.Y. 2009) ......................................................... 12, 14, 15

*Jennings v. Boenning & Co.*,
  482 F.2d 1128 (3d Cir. 1973)............................................................... 14

*Jiannaras v. Alfant*,
  27 N.Y.3d 349 (2016) ........................................................................ 23

*Mardice v. Ebony Media Operations, LLC*,
  2021 WL 146358 (S.D.N.Y. Jan. 15, 2021)........................................... 19

*New Falls Corp. v. Soni Holdings, LLC*,
  2022 WL 20058522 (E.D.N.Y. Sept. 13, 2022)...................................... 15

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985)........................................................................... 23

*Ret. Sys. of Ala. v. J.P. Morgan Chase & Co.*,
  386 F.3d 419 (2d Cir. 2004)......................................................... passim

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*,
  445 F. Supp. 2d 356 (S.D.N.Y. 2006) ............................... 11, 12, 13, 16

*Stanford v. Foamex L.P.*,
  2009 WL 1033607 (E.D. Pa. Apr. 15, 2009) ......................................... 19

*Thomson Kernaghan & Co. v. Glob. Intellicom, Inc.*,
  2000 WL 640653 (S.D.N.Y. May 17, 2000)........................................... 19

*U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC*,
  523 F. Supp. 2d 328 (S.D.N.Y. 2007) .............................................. 14, 16

*United States v. Real Prop. & Premises Located at 249-20 Cambria Ave., Little Neck, New York 11362*,
  21 F. Supp. 3d 247 (E.D.N.Y. 2014) .................................................... 18

*United States v. Schurkman*,
  728 F.3d 129 (2d Cir. 2013).......................................................... 11, 12

*Vernitron Corp. v. Benjamin*,
  440 F.2d 105 (2d Cir. 1971) ............................................................... 10

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005)................................................................. 24

*Wimberly v. Stern*,
  2023 WL 6466465 (S.D.N.Y. Oct. 4, 2023) .......................................... 10

*Wyly v. Weiss*,
  697 F.3d 131 (2d Cir. 2012)...................................................... 11, 12, 16

**Statutes**

15 U.S.C. § 77k ................................................................................................................ 7, 22

15 U.S.C. § 80 .................................................................................................................... 21

28 U.S.C. § 1651 ................................................................................................................. 2

28 U.S.C. § 2283 ................................................................................................................. 2

**Regulations**

17 C.F.R. § 229.510 ...................................................................................................... 20, 21

Plaintiffs in three pending Securities Act of 1933 (the "Securities Act") actions in New York state court (the "Opt-Out Plaintiffs") hereby object to the request of Special Master Andrew Calamari (the "Special Master") for a sweeping and open-ended injunction (the "Proposed Injunction") permanently blocking all state court proceedings against Defendant Infinity Q Diversified Alpha Fund (the "Mutual Fund") and its purported indemnitees.[1]

## PRELIMINARY STATEMENT

The reasoning behind the Special Master's request is as follows:  (i) he believes the Mutual Fund may have the obligation to indemnify certain defendants sued by the Opt-Out Plaintiffs; (ii) if he has to reserve funds to cover such potential liabilities, he cannot make full and final distributions; and (iii) accordingly, he should be allowed to effectively defeat those claims through imposition of a permanent injunction preventing litigation of the underlying claims.  Such reasoning, if accepted, would not only completely undermine the congressional purpose of the Securities Act, but would also be unconstitutional and contrary to the rule of law.

The Securities Act was passed to protect the integrity of the capital markets by requiring accurate and full disclosure of material information and by providing investors with broad statutory remedies against all those responsible for distributing materially false or misleading information. Through the Proposed Injunction, the Special Master seeks to strip investors in the Mutual Fund of their rights under the Securities Act and lavish immunity on the very actors who Congress has declared should be held accountable to those investors.  The relief the Special Master seeks is not only extraordinary; it also is unprecedented.

---

[1] The Opt-Out Plaintiffs' state actions are: *The Glenmede Trust Co., N.A. v. Infinity Q Capital Management LLC, et al.*, Index No. 160830/2022; *Carson Family 2013 Dynasty Trust, et al. v. Infinity Q Capital Management LLC, et al.*, Index No. 160834/2022; *Flint Hills Diversified Strategies, L.P., et al. v. Infinity Q Capital Management LLC, et al.*, Index No. 160964/2022.

The Special Master also is contradicting the representations he made to this Court. Specifically, to resolve the Opt-Out Plaintiffs' challenges to a litigation stay—which the SEC and the Mutual Fund had presented to this Court as "consented to" without providing any notice to impacted investors—the SEC and the Special Master agreed to modify the stay (the "Agreed-Upon Stay") so that the Opt-Out Plaintiffs could continue to pursue their Securities Act claims against the Mutual Fund's administrator, auditor, and underwriter, while indefinitely staying their claims against the Mutual Fund, its trustees, and its officers. In presenting the Agreed-Upon Stay to this Court, the Special Master represented that it "***appropriately balance[s] the due process rights of the Opt-Out Plaintiffs with the SEC's and the Special Master's overall goal of preserving the Mutual Fund's limited assets for the benefit of shareholders***." (ECF No. 36 at 2 (emphasis added).) However, the Special Master now seeks to effectively extend that stay unilaterally to the Mutual Fund's underwriter and potentially (although it is not clear from the vague language of the Proposed Injunction) prevent the Opt-Out Plaintiffs from pursuing discovery from the Mutual Fund, its trustees, and its officers. The Special Master provides no explanation (there is none) for why he is now reversing course or why the Agreed-Upon Stay no longer appropriately balances the Opt-Out Plaintiffs' rights with the Special Master's goals.

The Special Master is not entitled to the draconian relief he seeks for a number of reasons. *First*, the Anti-Injunction Act, 28 U.S.C. § 2283, and the All Writs Act, 28 U.S.C. § 1651, prohibit federal injunction of state claims unless the federal and state courts are asserting conflicting *in rem* jurisdiction over the same *res*. Here, however, the Special Master cannot establish that *either* court (much less *both* courts) are asserting *in rem* jurisdiction at all. This action is an *in personam* action against the Mutual Fund, and the Opt-Out Plaintiffs' state actions are indisputably *in personam* actions seeking only to establish each defendant's Securities Act liability.

*Second*, even if there were a potential *in rem* jurisdictional conflict (there is not), the Special Master makes no showing that the Proposed Injunction is *necessary* to protect this Court's jurisdiction, as required by the Anti-Injunction Act and All Writs Act.  Instead, the Special Master invokes the butterfly effect, speculating that—through a long, attenuated, and complex causal chain—the Opt-Out Plaintiffs continued prosecution of their state actions *might* someday adversely affect the Special Reserve, primarily as a result of Quasar Distributors, LLC ("Quasar")'s potential indemnity claim.  However, such potential obligations cannot be extinguished through the simple expedient of a permanent injunction against assertion of the claim.  Moreover, even if such contingent liabilities could be extinguished in such a way, each link in the contingent chain is riddled with uncertainty.  Among other infirmities, the Special Master does not establish that such an indemnity claim would be collectible from the Special Reserve, or that such an indemnity claim would survive obvious contractual and public policy challenges (it would not).

*Third*, regardless of the prohibitions of the Anti-Injunction Act and All Writs Act, the Proposed Injunction would violate the Opt-Out Plaintiffs' constitutional due process rights, both because (1) failure to disclose the defendants' intent to seek a permanent injunction from this Court against certain opt-out claims during the class settlement process constitutes an end-run around the due process protections integral to class notice and opt-out procedures and (2) the Special Master lacks roving authority to pick winners (Quasar) and losers (the Opt-Out Plaintiffs) based solely in his assessment of the merits and implications of their claims.

The Special Master's attempt to characterize the Opt-Out Plaintiffs as disruptive outcasts seeking preferential treatment is belied by the actual facts.  The legal fees advanced by the Mutual Fund in defense of the Opt-Out Plaintiffs' claims make up only a tiny fraction of the Mutual Fund's legal fees and expenses.  Moreover, far from resulting in all shareholders being treated equally,

the Proposed Injunction would result in unequal treatment *of the Opt-Out Plaintiffs*. Those who chose not to exercise their constitutional rights are being compensated for their claims against Quasar through the class settlement. Those who elected to opt-out and pursue their claims individually receive nothing from Quasar and will be deprived of a remedial opportunity that others obtained through their class participation. Accordingly, the Court should decline to enter the sweeping and permanent Proposed Injunction requested by the Special Master.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### I.   The Collapse of the Infinity Q Mutual Fund

The Mutual Fund was created as a series of the Trust for Advised Portfolios ("TAP")— one of U.S. Bank's multiple series trusts. U.S. Bank appointed its affiliate, U.S. Bancorp Fund Services, LLC ("U.S. Bancorp"), as "Administrator" of TAP. U.S. Bancorp was responsible for the Mutual Fund's management and oversight, which included appointing the Mutual Fund's trustees and the Mutual Fund's executive officers (who were all U.S. Bancorp employees). U.S. Bancorp also selected the auditor for the Mutual Fund (EisnerAmper LLP) and the underwriter for the Mutual Fund (Quasar, a then-U.S. Bancorp affiliate).

Unbeknownst to investors at the time, from at least 2018 through February 2021, the Mutual Fund was artificially and unlawfully inflating the values of its assets. The Mutual Fund's Chief Investment Officer, James Velissaris ("Velissaris"), mismodeled numerous derivative positions held by the Mutual Fund, artificially inflating their values. This mismodeling artificially inflated the Mutual Fund's net asset value ("NAV") by hundreds of millions of dollars. At one point in 2020, that NAV was inflated by more than 65%. Velissaris's massive overvaluations

---

[2] Citations herein to "SM Br." are to the Special Master's Memorandum of Law in Support of the Proposed Injunction (ECF No. 108). Citations herein to "Rolnick Decl." are to the Declaration of Lawrence M. Rolnick in Opposition to the Proposed Injunction, filed herewith.

raised a number of red flags that were visible to U.S. Bancorp, EisnerAmper, and Quasar. If these purported "gatekeepers" of the Mutual Fund had been adequately performing their compliance and oversight responsibilities, the fraud would have been prevented.

On February 22, 2021, following its confidential investigation of the Mutual Fund, the SEC ordered the Mutual Fund to suspend redemptions, liquidate its holdings, and cease operations. The Mutual Fund liquidated its entire portfolio as of March 19, 2021, generating $1,249,485,022 in proceeds, which was half a billion dollars less than what the Mutual Fund had told its investors its assets were worth prior to being shut down. The Mutual Fund made an interim distribution to investors in December 2021 of around $500 million, and a second interim distribution to investors of $170 million in mid-2022. The mutual fund left its remaining cash assets in a "Special Reserve." The Special Reserve has been used, among other things, to satisfy contingent obligations of the Mutual Fund, including substantial legal fees of the Special Master and his counsel. After the latest round of distributions, the Special Reserve today stands at just under $100 million.

## II.    The Class Settlement and the "Consented To" Litigation Stay

Several putative securities class actions were filed against, among others, TAP, U.S. Bancorp, the Mutual Fund's trustees and officers, EisnerAmper, and Quasar in both state and federal court. In the summer of 2022, the parties announced a proposed class action settlement that would resolve all federal securities claims against all potential defendants, but which would return to investors only a very small percentage of their losses. The parties sought approval of the settlement in New York state court. Quasar paid $2.5 million into the $39.75 million class settlement pot; TAP and the Mutual Fund's trustees and officers paid $4.6 million; and U.S. Bancorp paid $250,000. (Rolnick Decl., Ex. A at 19.)

Consistent with the due process requirements for class actions, the notice of settlement distributed to class members advised them that they had the right to opt out of the class settlement

to pursue their individual claims. Specifically, the notice read: "If you do not want to receive a payment from the Settlement, or you want to keep the right to sue or continue to sue Defendants on your own about the legal issues in the Litigation, then you must take steps to get out of the Class. This is called excluding yourself from, or 'opting out' of, the Class." (*Id.*, Ex. B at 11.) The notice did not advise class members that the defendants would seek a permanent litigation injunction in federal court—stymying the prosecution of claims for individual investors—that would render any opt-out right illusory. Nor did the Special Master or any other of the settling parties inform the New York state court that they would seek a litigation injunction from this Court against any opt-out claims. In December 2022, the Opt-Out Plaintiffs sent notices of exclusion to the class settlement administrator, abandoned any right to participate in the class settlement, and then filed their own actions in state court asserting claims under the Securities Act of 1933.

To manage distribution of the Mutual Fund's remaining cash assets, the Mutual Fund brokered a deal with the SEC to submit to a consent decree and place remaining cash in the Special Reserve under exclusive control of a court-appointed Special Master. This action is the result of that deal, and on January 10, 2023, this Court—at the SEC's and Mutual Fund's behest—entered a "Consented to Order Appointing Special Master and Imposing Litigation Injunction." (ECF No. 15 (the "January Order").) The January Order imposed a litigation injunction indefinitely staying all present and future litigation against any of the actors responsible for the collapse of the Mutual Fund (the "Original Stay"). However, the Original Stay was far from "consented to"—neither the SEC nor the Mutual Fund notified investors about the proposed injunction, and the Original Stay Order did not contain any procedures for investors to object to its entry or otherwise be heard.

Without any notice to the Opt-Out Plaintiffs, the Original Stay purported to indefinitely stay the Opt-Out Plaintiffs' state actions. Once the Opt-Out Plaintiffs learned that this Court had

been asked to issue an indefinite stay of their actions, they promptly notified the Court and sought to intervene in this action to modify the Original Stay as unconstitutional, unauthorized by statute, and in violation of both the Securities Act and binding Second Circuit precedent. (*See* ECF No. 23.) This Court granted the Opt-Out Plaintiffs' request for permission to intervene (ECF No. 32), and the next day the Opt-Out Plaintiffs filed their intervention motion (ECF Nos. 33-34.)

Presumably recognizing that it had substantially overstepped whatever bounds might exist to support such a broad stay, the SEC sought to appease the Opt-Out Plaintiffs. In return for the Opt-Out Plaintiffs agreeing to withdraw their intervention motion without prejudice, the SEC *and the Special Master* offered to modify the Original Stay Order to allow the Opt-Out Plaintiffs' state court claims to proceed against U.S. Bancorp, EisnerAmper, and Quasar. (*See* ECF No. 36 at 1-2.) Additionally, the SEC *and the Special Master* agreed to seek modification of the Original Stay to allow the Opt-Out Plaintiffs to seek discovery from the Mutual Fund, its officers, and its trustees. (*See* ECF No. 36-1 at 12 & n.1.) The SEC and the Special Master presented the new Agreed-Upon Stay to this Court as a resolution that "appropriately balance[s] the due process rights of the Opt-Out Plaintiffs with the SEC's and the Special Master's overall goal of preserving the Mutual Fund's limited assets for the benefit of shareholders." (ECF No. 36 at 2.) Presumably in reliance on this representation, on March 10, 2023, this Court entered the modified order (the "March Order"). (ECF No. 38.)

Following entry of the March Order, the Opt-Out Plaintiffs prosecuted their civil cases in New York Supreme Court, asserting statutory claims under Sections 11, Section 12, and Section 15 of the Securities Act against U.S. Bancorp, EisnerAmper, and Quasar. Quasar is specifically liable to investors for the Mutual Fund's false registration statement under Section 11(a)(5). 15 U.S.C. § 77k(a)(5). For his part, the Special Master has commenced lawsuits in New York State

Court against U.S. Bancorp and EisnerAmper, but not against Quasar, ostensibly because he believes—as set forth in his brief—that the Mutual Fund would be required to indemnify Quasar.

## III.    The Special Master Seeks the Proposed Injunction

Although the Special Reserve includes amounts necessary to satisfy future contingent liabilities—including the legal fees of the Special Master himself—the Special Master has decided that it is more expedient to simply shut down litigation against alleged wrongdoers if such wrongdoers might press claims for indemnification against the Mutual Fund.  In early 2024, the Special Master requested that the Opt-Out Plaintiffs file a voluntary dismissal of their claims against Quasar.  The rationale for this unexpected request was apparently a decision by the Special Master to cause the Mutual Fund to reimburse Quasar for its defense costs and indemnify it against any potential judgment obtained by the Opt-Out Plaintiffs under the Securities Act.

In an effort to try and resolve the Special Master's concerns, the Opt-Out Plaintiffs agreed to a temporary stay of their cases to see if they could settle their claims against Quasar and its former parent company, U.S. Bancorp.  (*See* ECF No. 96.)  However, despite participating in a formal mediation, a resolution could not be reached and the stay lifted.  (*See* ECF No. 103.)

Now, the Special Master seeks to permanently enjoin the Opt-Out Plaintiffs' state actions against TAP and the Mutual Fund's trustees and officers (collectively the "Stayed Parties"), and Quasar.  The request for a permanent injunction would not change the status quo with respect to the Stayed Parties, but it would with respect to Quasar.

## <u>ARGUMENT</u>

## I.    The Special Master Overstates the Court's Jurisdiction and Authority to Enjoin State Court Proceedings

### A.    The Court's Jurisdiction Is Narrowly Limited to the Special Reserve

The Special Master's request is predicated on the Court's assertion of jurisdiction over the

Special Reserve.  The March Order makes clear, however, that such jurisdiction extends *only* to the Special Reserve and not to the Mutual Fund, the Stayed Parties, or other penumbra of the Special Reserve.  (*Compare* ECF No. 38 ¶¶ 1-2 (asserting exclusive jurisdiction of the Special Reserve and listing limited powers of Special Master with respect thereto), *with id.* ¶ 3 (providing that all "powers, authorities, rights, and duties . . . with respect to the operation and administration of the [Mutual] Fund" that are not "expressly provided" to the Special Master are retained by the Mutual Fund's personnel).)  In other words, the Special Master was tasked with operating the Mutual Fund.  He was not given powers that the Mutual Fund itself did not have—including the power to extinguish claims against third parties in the event that he decided such claims might represent contingent liabilities to the Mutual Fund.  The Special Master had no authority to oversee a bankruptcy case or receivership, where an entire enterprise or estate is under judicial administration.  The judicial mandate here was much more circumscribed.

In an attempt to augment his narrow delegation of jurisdiction over a specific pool of funds—not over the entire enterprise (or claims against third parties that might one day affect the enterprise)—the Special Master points to catchall language providing supplementary jurisdiction over "all matters arising out of, and related to, the Special Reserve."  (SM Br. at 14.)  To adopt the Special Master's expansive reading of "arising out of, and related to," however, would cause the supplementary catchall provision to swallow the limitations expressly delineated in the rest of the March Order.  The result, as illustrated by the Special Master's requested Proposed Injunction, would be to convert the Special Master's limited mandate—*to wit*, to oversee the return of a specific pool of funds to shareholders—into a limitless, roving authority to enjoin any proceeding that *might*—in the Special Master's sole discretion—have some connection to the Mutual Fund. Indeed, the Special Master has turned the authority he was granted on its head.  If the Special

9

Master concludes that a contingent liability exists—or that the Mutual Fund has legal obligations (such as indemnities) that need to be met, his job is to husband existing funds to make sure they are sufficient to satisfy current and future legal obligations. He does not have the power to simply negate claims in order to distribute money that the Mutual Fund might need to meet legal obligations. Neither the March Order, nor statute, nor the Constitution countenance a grant of such unchecked authority under the guise of the Court's limited assertion of jurisdiction over the Special Reserve. *See, e.g.*, *Wimberly v. Stern*, 2023 WL 6466465, at \*11 (S.D.N.Y. Oct. 4, 2023) (quoting *Vernitron Corp. v. Benjamin*, 440 F.2d 105, 108 (2d Cir. 1971) (mere "related facts" or "embracing issues within the compass of the federal suit" are insufficient to enjoin state proceedings, "even if the federal court has exclusive jurisdiction over its case").

**B.    The All Writs Act Must Be Construed Narrowly in Furtherance of the Court's Already Limited Jurisdiction**

**1.    The All Writs Act Must Be Construed in Favor of the State Actions**

The Special Master concedes that the Proposed Injunction is barred by the Anti-Injunction Act to the extent such relief is not "necessary or appropriate in aid of [the Court's] jurisdiction" pursuant to the All Writs Act.[3]  (SM Br. at 12.)  The aid-of-jurisdiction exception, however, must be construed narrowly; "the Supreme Court has directed that '[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy.'"  *Ret. Sys. of*

---

[3] Whether an injunction of state proceedings (1) fits into the Anti-Injunction Act's aid-of-jurisdiction exception or (2) is appropriate exercise of jurisdiction under the All Writs Act are two sides of the same coin. *Ret. Sys. of Ala. v. J.P. Morgan Chase & Co.*, 386 F.3d 419, 425 n.5 (2d Cir. 2004) ("Because of the similarities in statutory language, cases interpreting the 'necessary or appropriate in aid of their respective jurisdictions' language of the All Writs Act are useful in interpreting the 'necessary in aid of its jurisdiction' language of the Anti–Injunction Act, and *vice versa*."); *United States v. Schurkman*, 728 F.3d 129, 135 (2d Cir. 2013) ("Th[e] statute[s] must be read in tandem.").

*Ala.*, 386 F.3d at 425-26 (quoting *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 297 (1970)); *see also Schurkman*, 728 F.3d at 135 ("Since the Anti-Injunction Act's prohibitory provision rests on the fundamental constitutional independence of the States and their courts, the exceptions should not be enlarged by loose statutory construction." (internal quotation marks omitted)); *Gov't Emps. Ins. Co. v. Granovsky*, 2022 WL 1810727, at *4 (E.D.N.Y. June 2, 2022) ("[T]he Court has counseled caution in identifying new applications of the exceptions.").[4]

## 2. The Aid-of-Jurisdiction Exception Applies Only to Conflicting *In Rem* Jurisdiction

"[O]nly parallel *in rem* actions, and not *in personam* actions, create interference with federal jurisdiction that allows for an injunction against a state proceeding." *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 445 F. Supp. 2d 356, 361 (S.D.N.Y. 2006). Hence, to invoke the aid-of-jurisdiction exception, the Special Master must establish that both this case and the state actions are conflicting *in rem* proceedings. *See Ret. Sys. of Ala.*, 386 F.3d at 426 ("A federal court with jurisdiction over an *in rem* action may enjoin a later-filed state court action involving the same *res*.").

Not disputing that *in rem* jurisdiction must be asserted by the federal court for the aid-of-jurisdiction exception to apply, the Special Master proceeds on the assumption—without authority—that the March Order constitutes an exercise of *in rem* jurisdiction over the Special Reserve. (*See* SM Br. at 12-14.) But that is not true. This action was filed as an *in personam* action against the Mutual Fund and, although the case is now focused on the allocation of the

---

[4] The Special Master mischaracterizes the Court's "discretion" to issue the Proposed Injunction. (*Cf.* SM Br. at 12.) The *form* of an appropriate injunction is discretionary, but whether the All Writs Act empowers injunctive relief in these circumstances is a question of law. *Wyly v. Weiss*, 697 F.3d 131, 137 (2d Cir. 2012) ("We review the District Court's . . . interpretation of the All Writs Act and the Anti–Injunction Act *de novo*."); *see also Ret. Sys. of Ala.*, 386 F.3d at 431 & n.11.

certain Mutual Fund assets comprising the Special Reserve, that does not transform the nature of the Court's jurisdiction. *See SR Int'l*, 445 F. Supp. 2d at 361 (rejecting "fanciful" argument that disputed insurance proceeds not formally deposited with the Court constitute a "res" and observing that courts "explicitly and implicitly refused to treat insurance proceeds as a res for purposes of the Anti-Injunction Act."). Hence, the Special Master's request does not even clear the threshold step of establishing federal *in rem* jurisdiction.

Even assuming that the Court has asserted *in rem* jurisdiction over the Special Reserve, the aid-of-jurisdiction exception still does not apply because the Opt-Out Plaintiffs' state actions are indisputably *in personam* actions seeking only to establish each defendant's Securities Act liability. *Ret. Sys. of Ala.*, 386 F.3d at 426 ("[A]n *in personam* action involves a controversy over liability rather than over possession of a thing."). Indeed, "[t]he Supreme Court has never held that a district court may enjoin a parallel *in personam* action under the 'in aid of jurisdiction' exception." *Wyly*, 697 F.3d at 138. This is fatal to the Special Master's request.

### 3. Baldwin–United and Reserve Fund Do Not Control Here

To circumvent the black-letter bar on enjoining state *in personam* actions, the Special Master invokes an exceedingly narrow exception from *In re Baldwin-United Corp.*, 770 F.2d 328 (2d Cir. 1985), which purportedly was applied in *In re The Reserve Fund Sec. & Derivative Litig.*, 673 F. Supp. 2d 182 (S.D.N.Y. 2009). To the extent those cases remain good law, the Second Circuit has repeatedly cautioned against expanding their reach and, in any event, they are distinguishable on their facts.

The *Baldwin–United* "litigation consist[ed] of consolidated multidistrict class actions which, following two years of settlement negotiations brokered by the district court" were "in the final stages of settlement at the time the state court suit [wa]s filed." *Schurkman*, 728 F.3d at 138. Under those specific circumstances, the Second Circuit "recognized only one, narrow exception

to th[e] rule" against enjoining *in personam* state actions: "where a state court action fatally threatens imminent resolution of a complex proceeding that is so advanced that its resolution is analogous to a res over which the district court requires control." *Brink's Glob. Servs. USA, Inc. v. Midwest Goldbuyers, Inc.*, 2017 WL 6887593, at *2 (S.D.N.Y. Dec. 12, 2017).  In doing so, the Second Circuit made clear the "crucial" fact in *Baldwin–United* was "that most of the defendants had already settled, and that there was a 'substantially significant prospect that the other eight defendants will settle in the reasonably near future.'" *Ret. Sys. of Ala.*, 386 F.3d at 427 (brackets omitted).  Thus, "if it should appear that prompt settlement was no longer likely," then "the situation would fall within the [usual] rule that *in personam* proceedings in state court cannot be enjoined." *Id.* (cleaned up).  The only circumstance in which *Baldwin–United* applies, therefore, is when the federal case is on the cusp of achieving a negotiated global peace.  In other words, the focus is not on "the case's public importance, complexity, or length of pendency in federal court, but on the proximity of a final resolution"—namely, a global settlement—"that a state action would not merely complicate or impede, but actually undermine."  *SR Int'l*, 445 F. Supp. 2d at 363.

The Court of Appeals has "since taken pains" to limit *Baldwin-United* to its own narrow facts.  "Since *Baldwin–United Corp.* was decided almost forty years ago, the Second Circuit has repeatedly refused to extend its holding . . . , emphasizing that *Baldwin–United Corp* presented 'exceptional circumstances' and that the 'in aid of jurisdiction' exception 'is generally reserved for state court actions *in rem*.'" *Am. Transit Ins. Co. v. Pierre*, 2024 WL 2214525, at *5 (E.D.N.Y. May 16, 2024) (citations omitted).  In fact, *Baldwin-United* remains the *only* instance in which "[t]he Second Circuit appears to have applied the necessary-in-aid-of-jurisdiction exception to an *in personam* case."  *Granovsky*, 2022 WL 1810727, at *4; *see also In re HSBC Bank, USA, N.A.,*

*Debit Card Overdraft Fee Litig.*, 99 F. Supp. 3d 288, 303 (E.D.N.Y. 2015) (collecting cases).

Here, the Special Master presents no evidence to suggest that complete resolution is nearby with respect to *any* wrongdoer, much less comprehensive settlement negotiations on the brink of global peace.  Unlike *Baldwin-United*, there is "no a multidistrict litigation; there is no plaintiff class; and (most critically) the parties and the Court have not expended substantial resources crafting a large number of individual settlements that would be blown up by the state cases." *Granovsky*, 2022 WL 1810727, at *5; *see also U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC*, 523 F. Supp. 2d 328, 337 (S.D.N.Y. 2007) (rejecting applicability of *Baldwin-United* where "a resolution of the matter does not appear to be on the horizon").  Indeed, the only settlement thus far—the class settlement—resulted from *state* proceedings, not any exercise of this Court's jurisdiction that could be aided by the Proposed Injunction.[5]

The Special Master's reliance on *Reserve Fund* is similarly misplaced.  As a threshold matter, *Reserve Fund* is wrongly decided to the extent it applies traditional (*i.e.*, not *Baldwin-United*) aid-of-jurisdiction principles.  That is because the *Reserve Fund* court's concern that "[a] state court could grant relief to an individual claimant and siphon assets away from the res without regard to any equitable concerns," 673 F. Supp. 2d at 203, is unfounded.  State *in personam* judgments do not siphon assets away from a *res*.  In any event, *Reserve Fund* is also wrong in its application of *Baldwin-United*, given the Second Circuit's clear focus on imminence of a global consensual settlement, *Ret. Sys. of Ala.*, 386 F.3d at 427-28, whereas the *Reserve Fund* court achieved final resolution only by its own fiat.

---

[5] *See Amaranth*, 523 F. Supp. 2d at 337-38 ("[T]he All–Writs Act empowers courts to issue an injunction 'in aid of *their* respective jurisdictions'— not in aid of another forum's jurisdiction."); *Jennings v. Boenning & Co.*, 482 F.2d 1128, 1135 (3d Cir. 1973) ("[W]e emphasize . . . that here there was no *federal* court judgment to protect. At issue was a *state* court judgment.").

Moreover, *Reserve Fund* is readily distinguishable from the case at bar.  The *Reserve Fund* court: took possession of the fund at issue; evaluated competing plans for final distribution; approved one such plan; and, only then, issued an anti-suit injunction simultaneous with entering the final plan of distribution.  *Reserve Fund*, 673 F. Supp. 2d at 195-99.  Here, in contrast: the Court and the Special Master have, at most, exercised jurisdiction over the Special Reserve, and not the Mutual Fund.  There is no proposal of a *final* plan, as the SLC's continued litigation will require additional funding from the Special Reserve, and may lead to additional recoveries.  There are no competing proposals for the Court to consider—much less enter—that would bring finality.  Hence, there is no such global peace to "aid" with a simultaneously entered anti-suit injunction.

## II.     The Proposed Injunction Is Not Necessary to Aid the Court's Jurisdiction

The Special Master makes no showing that the Proposed Injunction is, in fact, *necessary* to aid the purported jurisdiction.  *See In re HSBC Bank*, 99 F. Supp. at 300 ("One reason why doubts must be resolved against a federal injunction is the word 'necessary.'").  At most, the Special Master speculates that the Opt-Out Plaintiffs' state actions *might* generate costs or judgments, for which certain parties *might* claim indemnity from TAP, and those parties *might* prevail, in which case they *might* seek to recover from the Special Reserve, all of which *might* have the effect of delaying or complicating final distribution of the Special Reserve.  That is too tenuous a chain of events (and too ambiguous an effect on the Special Reserve) to justify permanently extinguishing the Opt-Out Plaintiffs' state actions against a statutory defendant that Congress has determined is liable to investors for material misrepresentations in the registration statement.  *See New Falls Corp. v. Soni Holdings, LLC*, 2022 WL 20058522, at *3 (E.D.N.Y. Sept. 13, 2022) (internal quotation marks omitted) ("[A] federal court's concern that a state court *might* enter a judgment that would conflict with a prior federal judgment is not a basis to enjoin the state court suit.").  This Court should decline the Special Master's invitation to pile conjecture on top

of inference on top of speculation to snuff out otherwise valid claims on the notion that they could

someday snowball into impairment of the Court's administration of the Special Reserve.

### A.  Mere Uncertainty, Inconvenience, or Delay Does Not Justify the Proposed Injunction

The only "fact" the Special Master provides in support of the Proposed Injunction is that

he cannot (in his view) fully distribute the Special Reserve until the Opt-Out Plaintiffs' state

actions are resolved because (in his view) Quasar may seek indemnification from TAP and,

ultimately, seek to collect from the Special Reserve.  (*See* SM Br. at 14-15.)[6]  But these concerns

do not justify the Proposed Injunction.  Rather, to qualify for the aid-of-jurisdiction exception,

"[t]he injunction must 'prevent a state court from so interfering with a federal court's consideration

or disposition of a case as to seriously impair the federal court's flexibility and authority to decide

that case.'"  *Brink's Glob. Servs.*, 2017 WL 6887593, at *2 (quoting *Atl. Coast Line R.R. Co.*, 398

U.S. at 295); *see also Amaranth*, 523 F. Supp. 2d at 337; *Wyly*, 697 F.3d at 139  ("We have never

held that a district court's involvement in complex litigation justifies, without more, issuance of

an injunction 'in aid of' the court's jurisdiction."); *SR Int'l*, 445 F. Supp. 2d at 363.

Here, even assuming that resolution of this case could be complicated or delayed by

developments in the state actions, the Court's ability to approve (or not approve) distributions of

the Special Reserve—whether as compensation to shareholders, payment of the Special Master's

fees, payment of indemnity claims, or otherwise—remains unaffected.[7]  As the Second Circuit

---

[6] Even though the Special Master also references the payment of the Mutual Fund's legal fees and indemnification of the trustees and officers (SM Br. at 15), the Opt-Out Plaintiffs are not prosecuting their claims against those entities and individuals pursuant to the Agreed-Upon Stay.

[7] This is true regardless of whether Quasar seeks distribution now as "advancement" or later as "indemnification"—which is not a meaningful distinction for present purposes. In all events, enforcing such contractual payments would require Quasar to bring claims on the underlying contract and, if successful, seek a distribution from the Special Reserve, subject to the Court's jurisdiction, to collect on that judgment.

made clear:

> Any time parallel state and federal actions are proceeding against the same defendant, it is conceivable that occurrences in the state action will cause delay in the federal action, by provoking motion practice in federal court regarding the effects of state-court rulings, or simply by diverting the attention of the defendant. Such a rule would in effect create an additional exception to the Anti–Injunction Act for circumstances where a federal court finds it *convenient* to enjoin related state proceedings—an approach contrary to the Supreme Court's direction that we construe doubts about the permissibility of an injunction "in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy."

*Ret. Sys. of Ala.*, 386 F.3d at 430 (quoting *Atl. Coast Line R.R.*, 398 U.S. at 297); *see also id.* at 429 ("No court of appeals has extended the All Writs Act so broadly (or construed the Anti–Injunction Act so narrowly)."). The Court's administration of the Special Reserve may be *informed by* developments in the Opt-Out Plaintiffs state actions—*e.g.*, the development of the factual record—but it is not *impaired* by those proceedings. The Court retains sole jurisdiction over distributions from the Special Reserve in all events.

Regardless, the Special Master's fretting about potential effects of the Opt-Outs Plaintiffs' state claims on the Special Reserve are belied by his own state action against potential-indemnitee U.S. Bancorp, which presents the *exact same* issue. The Special Master has commenced an action in state court against U.S. Bancorp (Rolnick Decl., Ex. C), which the March Order recognizes may "augment" the Special Reserve if he recovers (ECF No. 38 ¶ 4) or deplete it through legal fees if he does not (*see id.* ¶ 27). The Special Master's action against U.S. Bancorp is more likely to implicate the Special Reserve than the Opt-Out Plaintiffs' state action against Quasar because the former will *certainly* incur the Special Master's own legal fees, whereas the effect of Quasar's potential indemnity claim on the Special Reserve is much less certain.

**B.      Quasar's Indemnity Claim Does Not Justify the Proposed Injunction**

**1.      The Special Master Does Not Establish that Quasar's Indemnity Claim Would be Collectable from the Special Reserve**

The Proposed Injunction rests on the premise that a future indemnity claim by Quasar will be collectable from the Special Reserve.  But the Special Master does not establish that fact.  Even assuming that Quasar could obtain a judgment on its dubious indemnity claim against TAP, *see infra* § II.B.2, collection is another matter.  Factually, there is no guarantee that other buckets of recovery will not be available.  By that time, there may be proceeds generated from the SLC's suits against U.S. Bancorp, EisnerAmper, and maybe others, including Quasar itself.

Procedurally, too, the Special Master does not establish why an indemnity judgment would be collectible from the Special Reserve.  An indemnity judgment from a state court does not take money out of the Special Reserve; that property "remains in the possession" of the Special Reserve. *United States v. Real Prop. & Premises Located at 249-20 Cambria Ave., Little Neck, New York 11362*, 21 F. Supp. 3d 247, 254 (E.D.N.Y. 2014).   If Quasar then commenced collection proceedings against the Special Reserve, perhaps *those proceedings* would threaten to impair the Court's jurisdiction, but that is not the question at bar.  *See id.* at 253-254 (permitting state *in personam* action to proceed simultaneous with federal *in rem* action and observing that potential collection against the property seized by the federal government was a separate issue).

More fundamentally, the Special Master does not explain why the Court should be looking ahead to Quasar's collection interests *at all*.   "[T]he necessary-in-aid-of-jurisdiction exception applies (by definition) when necessary to protect *the Court's* jurisdiction—not when it is desirable, or even necessary, to protect a private party's litigation position."  *Gov't Emps. Ins. Co. v. Granovsky*, 2022 WL 1810727, at *6 (E.D.N.Y. June 2, 2022).   If the Special Reserve is distributed, and TAP is otherwise unable to satisfy a later-obtained indemnity judgment, Quasar

will simply be in the same position as numerous litigants across the nation: pursuing a judgment-proof defendant.[8]  *See Am. Transit Ins. Co. v. Pierre*, 2024 WL 2214525, at *5 (E.D.N.Y. May 16, 2024) (declining to apply the aid-of-jurisdiction exception "on the prospect that state court judgments . . . could limit the relief available" in the federal proceedings).  Congress has determined that Quasar should be held accountable for misstatements in the registration statement as a statutory underwriter.  Permanently extinguishing any party's claim is always an extraordinary remedy, but the Special Master's request that the Court *preemptively protect the prospective indemnity interests of a Securities Act violator* is truly astonishing.

2.    **The Special Master Does Not Establish that Quasar's Indemnity Claim Would be Viable in The First Place**

a.    **There Are Serious Doubts About the Viability of Quasar's Indemnity Claim Under the Relevant Contract**

The Special Master asks the Court to accept his preliminary, untested view that Quasar is likely to prevail on a contractual indemnity claim against TAP arising from the Opt-Out Plaintiffs' state action against Quasar.  The Special Master does not mention defenses that TAP could assert against such claim, much less explain why those defenses would not succeed.

---

[8] Often, a defendant's potential inability to satisfy a later indemnity claim is addressed through bankruptcy proceedings.  But this is not a bankruptcy case, and—even if it were—the relevant bankruptcy framework counsels against extinguishing Opt-Out Plaintiffs' state actions in favor of Quasar's potential indemnity claim.  Indeed, bankruptcy courts uniformly hold that federal *in rem* jurisdiction is threatened only where entitlement to indemnification from the res is "absolute." *Garcia v. Hatchet Works Corp.*, 659 B.R. 626, 631-32 (E.D.N.Y. 2024) (declining to stay claims against third-party indemnitees); *In re Roman Cath. Diocese of Rockville Ctr., New York*, 651 B.R. 622, 648-49 (Bankr. S.D.N.Y. 2023) (declining to enjoin claims against third-party indemnitees). There is no "absolute" indemnity here for two reasons.  First, the Opt-Out Plaintiffs' claims against Quasar arise from Quasar's breach of its *own* statutory duty—not merely vicarious liability of TAP.  *See Garcia*, 659 B.R. at 632; *see also Mardice v. Ebony Media Operations, LLC*, 2021 WL 146358, at *3 (S.D.N.Y. Jan. 15, 2021); *Thomson Kernaghan & Co. v. Glob. Intellicom, Inc.*, 2000 WL 640653, at *15 (S.D.N.Y. May 17, 2000).  Second, as set forth below, both the contract and public policy "contain provisions that limit [TAP]'s obligation to indemnify," meaning such obligations are not sufficiently "absolute" to threaten federal *in rem* jurisdiction.  *Stanford v. Foamex L.P.*, 2009 WL 1033607, at *2 & n.9 (E.D. Pa. Apr. 15, 2009).

Nonetheless, one powerful defense jumps right off the page.  Namely, the relevant contract provides for *mutual* indemnity that, in these circumstances, cancels out any potential indemnity benefit to Quasar arising from Quasar's own Securities Act liability.  As set forth therein:

> [Quasar] shall indemnify, defend and hold [TAP] free and harmless from and against any and all Losses that [TAP] may sustain or incur or that may be asserted against [TAP] by any person . . . based upon [Quasar]'s . . . negligence.

(ECF No. 110-2 § 8.D.)  The Special Master concedes that a judgment in the Opt-Out Plaintiffs' state action against Quasar would establish Quasar's negligence.  (SM Br. at 19 ("[T]he Opt-Out Plaintiffs' three surviving causes of action will require a finding of . . . negligence.").)  Thus, a resulting indemnity payment from TAP to Quasar would be a loss sustained by TAP based on Quasar's negligence and, therefore, would itself be indemnifiable by Quasar.  Indeed, the Special Master is prosecuting an indemnity claim based on similar facts and *identical* language against U.S. Bancorp.  (Rolnick Decl., Ex. C ¶¶ 91-97 (seeking indemnity from U.S. Bancorp under identical provision for TAP's payouts on account of TAP's indemnity obligations); *see also id.* Ex. D at 22.)  The Special Master cannot turn around here and take an opposite position with respect to Quasar.[9]

### b. There Are Serious Doubts About the Enforceability of Quasar's Indemnity Claim Under Public Policy

The SEC's official position is that indemnification for securities laws violations is "against public policy" and "unenforceable."  17 C.F.R. § 229.510.  In addition to the SEC's disapproval

---

[9] The Special Master's note that U.S. Bancorp is alleged to have breached its contractual standard of care is a red herring.  (*See* SM Br. at 4 n.5.)  As the Special Master himself argues, the mutual indemnity provisions in favor of TAP make clear that TAP may seek indemnity from U.S. Bancorp and Quasar arising from their "negligence"—regardless of whether such negligence is also grounds for a separate breach of contract claim (or a defense to U.S. Bancorp or Quasar's indemnity claims).  (*See* Rolnick Decl. Ex. D at 22 (distinguishing between TAP's indemnity rights and contractual standard-of-care rights).)

of indemnification for securities law violations, "[g]iven the risk that indemnification agreements will undermine the strong public policy underlying the anti-fraud provisions of the 1933 and 1934 Acts, courts are reticent to enforce them." *Credit Suisse First Bos., LLC v. Intershop Commc'ns AG*, 407 F. Supp. 2d 541, 546 (S.D.N.Y. 2006). In *Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1288 (2d Cir. 1969), the Second Circuit affirmed the district court's denial of indemnification where an underwriter had actual knowledge of material misstatements in an offering document. Although *Globus* involved intentional misconduct, "its analysis of public policy was explicitly based on Section 11 of the 1933 Act which establishes negligence as a basis for liability." *Intershop*, 407 F. Supp. 2d at 547. Thus, "[i]t is hardly surprising that courts in this district and elsewhere readily extended *Globus*'s reasoning to preclude indemnification in cases involving negligent misrepresentations." *Id.* In addition, "*Globus* has also been extended to prohibit indemnification of a party who settles securities law claims without admitting fault, *unless* that party actually demonstrates that it is without fault." *Id.* Based on the allegations in the Opt-Out Plaintiffs' state court complaints, it is unlikely that Quasar will be able to seek indemnification against the Mutual Fund.

The Special Master concedes that Quasar's indemnity claim is voidable as a matter of public policy if Quasar's wrongdoing rises above simple negligence. (SM Br. at 19-20 (citing 15 U.S.C. § 80a-17(h), (i), 17 C.F.R. § 229.510, and *Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1288 (2d Cir. 1969).) From this, the Special Master concludes that such bar will not apply because the Opt-Out Plaintiffs need not prove anything beyond negligence—and therefore need not "adduce sufficient facts to demonstrate scienter on the part of Quasar"—to prevail on their Securities Act claims. (*Id.* at 19.) But the pertinent question is not whether Opt-Out Plaintiffs will be able to adduce evidence of scienter in their Securities Act case (they have no such burden—

instead, it is Quasar's burden to show that it acted reasonably and without knowledge, *see* 15 U.S.C. § 77k(b)(3)); it is whether Quasar will be able to establish that its indemnity rights are enforceable in its subsequent indemnity action.  To justify the Proposed Injunction, therefore, it is the Special Master's burden to adduce evidence showing that Quasar's indemnity rights will be enforceable in *that* proceeding, and he does not even attempt to do so.  Nor could he, given that barely any discovery has yet been taken against Quasar in any action related to the underlying fraud.  Hence, there is no factual basis for the Court to conclude that Quasar's wrongdoing did not rise to a level that voids its indemnity.

To the extent that the Special Master has elected to advance Quasar's legal fees, that does not provide a basis for the Proposed Injunction.  (*See* SM Br. at 18.)  Even if being properly advanced (for which the Special Master has provided no evidence), those expenses constitute just a small fraction of the Mutual Fund's fees and costs.  According to documents submitted to this Court by the Special Master, between January 10, 2023, and June 30, 2024, the legal expenses incurred by Quasar in defending the Opt-Out Plaintiffs' claims constituted just 7% of the over $5 million in disbursements that the Special Master made during that time period.  (ECF No. 104-1 at 2-3 ("Davis Wright Tremaine LLP" expenses for "Glenmede Trust").)  The Special Master's unsupported claim that the issuance of the Proposed Injunction will suddenly allow him to distribute the Special Reserve to investors (SM. Br. at 17) strains credulity.

### C.  Limited Discovery from the Stayed Parties Does Not Justify the Proposed Injunction

To the extent the Proposed Injunction purports to enjoin discovery proceedings (*e.g.*, third-party subpoenas) against the Stayed Parties, the Proposed Injunction goes too far.  *First*, for the same reasons set forth above with respect to Quasar, the Special Master has not established that the relevant indemnitee provisions necessarily threaten the Court's jurisdiction over the Special

Reserve.  *Second*, only *de minimis* costs will be incurred because the Mutual Fund's officers and trustees are natural persons who are unlikely to have a significant number of documents in their custody, so their only notable discovery expense will be sitting for a deposition.[10]  *Third*, unlike ultimate resolution of Opt-Out Plaintiffs' substantive claims, discovery is expected to conclude in a matter of months.  *Fourth*, the Special Master is likely to seek the same discovery in aid of his suit against U.S. Bancorp.  *Finally*, the SEC, Special Master and the Opt-Out Plaintiffs expressly agreed that the Opt-Out Plaintiffs should be able to seek such discovery.  (ECF No. 38 at 12 & n.1.)  There has been no change in circumstances that now justifies the Special Master seeking to unilaterally unwind that agreement.

## III.    The Proposed Injunction Violates Due Process

### A.    The Proposed Injunction Abridges the Due Process Protections Underpinning the Class Settlement

Due process requires that absent class members be permitted to opt out and pursue individual claims *upon notice of the pertinent facts and legal consequences.  See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 807-08, 811-12 (1985).  Thus, before approving a settlement that releases claims for money damages against a defendant, a court must provide absent class members with notice and the opportunity to opt-out of the settlement so that they can pursue their own claims.  *Id.* at 812; *see also Jiannaras v. Alfant*, 27 N.Y.3d 349, 351 (2016); *In re Colt Indus. S'holder Litig.*, 77 N.Y.2d 185, 197 (1991).  This right is inviolate.  *See Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 222 (2d Cir. 2012).

---

[10] Moreover, because the Stayed Parties appeared to have communicated about the relevant matters primarily through channels and accounts in U.S. Bancorp's custody, any documents they do have are likely to be duplicative of documents produced by U.S. Bancorp and the Stayed Parties would not need to reproduce such duplicates.

The Proposed Injunction would eliminate the Opt-Out Plaintiffs' constitutional right to opt-out. Although the class action settlement purports to give members the opportunity to opt out, when combined with the Proposed Injunction, that right is rendered completely illusory with respect to Quasar. The Proposed Injunction would eliminate the very right that the Opt-Out Plaintiffs were trying to protect by submitting requests to be excluded from the class action settlement because it would prohibit them from pursuing claims outside of the class against Quasar.

The Special Master concedes that opt-out rights are constitutionally inviolate, but he argues that opt-out rights are nonetheless respected where a subsequent, intervening event—like a bankruptcy—impedes an opt-out plaintiff's ability to further press its opt-out action. (SM Br. at 21-22.) This argument is inapposite because the Proposed Injunction is not the product of a *subsequent* intervening event. Rather, TAP and the SEC brokered a deal to seek federal injunctive relief against opt-out claims *during the course of the class settlement approval process*. Yet, that deal was not disclosed to absent class members, including the Opt-Out Plaintiffs, despite its obvious implications on their choice whether to opt-out or participate in the class settlement. The unreasonable withholding of that critical fact violates due process. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 113-14 (2d Cir. 2005) (internal quotation marks omitted) ("The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness. . . . [T]he settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings."); *see also In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 759 (E.D.N.Y. 1984) ("[N]otice provides an opportunity to class members to make their objections known to the court and enables both objectors and supporters to bring to the court's attention relevant facts concerning the settlement.").

The prejudice is apparent: if the Proposed Injunction is entered, the Opt-Out Plaintiffs would be in the "unfair" position of foregoing class settlement proceeds "without full knowledge or understanding of the benefits which could be derived contrasted with the likely result of opting-out." *In re Baldwin-United Corp.*, 607 F. Supp. 1312, 1335 (S.D.N.Y. 1985). This belies the Special Master's contention that the Proposed Injunction would "ensure that all current shareholders are treated equitably" (SM Br. at 1, 16-17); in reality, the Opt-Out Plaintiffs would receive *less* than other shareholders because they did not receive class settlement proceeds.

### B. The Special Master Lacks Roving Authority to Pick Winners and Losers

The Proposed Injunction reflects the Special Master's apparent view that he may adjudicate other parties' substantive rights and claims in his pursuit of shareholders' best interests. He purports to exercise roving authority to determine, *inter alia*, that Quasar's indemnity claim against TAP has merit (and that such claim is collectable from the Special Reserve), that U.S. Bancorp's indemnity claim lacks merit, and that the Opt-Out Plaintiffs' state claims against Quasar are somehow a lower priority than Quasar's indemnity claim such that—if one of them must give way to protect the Special Reserve—he gets to say that Quasar comes out on top. But he holds no such roving authority to pick winners and losers based on his own assessment (and speculation) of how various arguments might fare in court. Due process, of course, requires that those arguments be actually aired and adjudicated *in court*.

### <u>CONCLUSION</u>

For the reasons set forth above, the Court should deny the Special Master's request for a permanent injunction and leave in place the existing indefinite stay agreed to by the parties.

Dated: October 17, 2024

Respectfully submitted,

By: */s/ Lawrence M. Rolnick*
Lawrence M. Rolnick
Marc B. Kramer
Michael J. Hampson
**ROLNICK KRAMER SADIGHI LLP**
1251 Avenue of the Americas
New York, New York 10020
(212) 597-2800
lrolnick@rksllp.com
mkramer@rksllp.com
mhampson@rksllp.com

*Attorneys for the Opt-Out Plaintiffs*