UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,

                      Plaintiff,

                                                  22-cv-9608 (PKC)

        -against-                                     <u>ORDER</u>

INFINITY Q DIVERSIFIED ALPHA FUND,

                      Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        Nell Elizabeth Mathews, a shareholder of the Infinity Q Diversified Alpha Fund (the "Fund"), contends that her distributions under the Plan of Distribution of Assets adopted by the Trust for Advised Portfolios' Board of Trustees on November 8, 2021 (the "November 2021 Plan") (ECF 83-2) and the Amended Plan of Distribution approved by the Court on March 26, 2024 (the "March 2024 Plan") (ECF 83-1; ECF 89) were incorrectly calculated. Mathews argues that the Fund made improper offsets to her distributions based solely on her sale of 488.654 Fund shares in April and May 2020 at inflated prices without considering her repurchase of 435.802 shares in June 2020 at similarly inflated prices. As a result, Mathews did not receive any distributions pursuant to the Fund's Second Interim Distribution and Third Interim Distribution and only a partial distribution pursuant to the Fourth Interim Distribution. The Special Master, Andrew M. Calamari, concluded that Mathews's distributions were properly offset because the November 2021 Plan and the March 2024 Plan do not contemplate the reduction of a shareholder's offset based on their repurchase of Fund shares at inflated prices. For the

following reasons, the Court overrules Mathews's objections to the recommendation and findings of fact and conclusions of law of the Special Master and, upon de novo review, adopts them insofar as they determine distributions to Mathews.

BACKGROUND

As of March 2021, the Fund's portfolio was entirely liquidated after it was determined that for about four years prior the Fund's daily net asset value ("NAV") of its shares had been falsely inflated. (ECF 1 ¶ 4; ECF 83-2 at 4.) The November 2021 Plan was prepared to facilitate the distribution of the Fund's liquidated assets to its shareholders and was reviewed by the Securities and Exchange Commission. (ECF 83-2 at 2.) The November 2021 Plan provides that "the assets of the Fund will be distributed to shareholders . . . that owned shares of the Fund at 8:00 a.m. Eastern Standard Time on February 19, 2021," or the "Measurement Date." (Id.) In describing the distribution approach, the November 2021 Plan states that "the assets of the Fund attributable to each class of shares will be distributed to the Distributees *pro rata* based on the number of shares the Distributee held in that Class on the Measurement Date relative to the aggregate shares held by all Distributees in that Class on the Measurement Date, less any offsetting claims the Fund has against that Distributee." (Id. at 7 (footnote omitted)). The Fund's First, Second, and Third Interim Distributions were made in accordance with the terms of the November 2021 Plan..[1]

The Shareholder Notice issued in connection with the First Interim Distribution further explains as to the Fund's potential offsets that "[i]n calculating each shareholder's pro

---

[1] https://www.infinityqfundliquidation.com/cases/q%20proposal/infinity%20q%20-%20fund_%20shareholder%20notice%20-%20initial%20distribution%20%28final%2011-8-2021%29.pdf; https://www.infinityqfundliquidation.com/cases/q%20proposal/iq%20fund_%20shareholder%20notice%20-%20second%20interim%20distribution%20%28april%202022%29.pdf; https://www.infinityqfundliquidation.com/cases/Infinity%20Q/12.5.2023%20Notice%20of%20Third%20Interim%20Distribution.pdf (last accessed Oct. 1, 2025).

rata share, the Fund may make offsets based on any amounts previously received by that shareholder on a prior redemption of Fund shares pursuant to a NAV that the Fund determined was overstated."[2] Similarly, the Shareholder Notices issued in connection with the Second and Third Interim Distributions state that "[i]n calculating each shareholder's pro rata share, the Fund will also make offsets based on any amounts previously received by that shareholder on prior purchases and redemptions of Fund shares pursuant to" overstated NAVs.[3] The Fund also established a Frequently Asked Questions webpage that provides information to shareholders regarding the offset methodology.[4] The webpage explains to shareholders that did not receive one or more of the Interim Distributions that this may have been due to "ACCOUNTS WITH HOLDBACKS FOR NET GAINS."[5] These are described as "a small number of current shareholder accounts for which the Fund is not making one or more interim distributions based on amounts previously received by that shareholder on one or more redemptions of Fund shares prior to February 18, 2021 pursuant to a NAV that the Fund has determined was overstated."[6] With respect to the Second Interim Distribution, the webpage states that "[i]n calculating each shareholder's pro rata share, the Fund will also make offsets based on that shareholder's net gains from prior acquisitions and redemptions of Fund shares (before February 19, 2021) pursuant to NAVs that the Fund determined were overstated."[7]

---

[2] https://www.infinityqfundliquidation.com/cases/q%20proposal/infinity%20q%20-%20fund_%20shareholder%20notice%20-%20initial%20distribution%20%28final%2011-8-2021%29.pdf.
[3] https://www.infinityqfundliquidation.com/cases/q%20proposal/iq%20fund_%20shareholder%20notice%20-%20second%20interim%20distribution%20%28april%202022%29.pdf;
https://www.infinityqfundliquidation.com/cases/Infinity%20Q/12.5.2023%20Notice%20of%20Third%20Interim%20Distribution.pdf.
[4] https://www.infinityqfundliquidation.com/faq (last accessed Oct. 1, 2025).
[5] Id.
[6] Id.
[7] Id.

The Special Master was appointed by the Court on January 10, 2023 pursuant to Rule 53(a)(1), Fed. R. Civ. P. (ECF 15 at 5.) Among other things, he was tasked with "oversee[ing] and manag[ing]" the November 2021 Plan and was granted the "authority to make recommendations . . . to amend the Plan, subject to Court approval, to ensure a fair and equitable distribution . . . ." (Id. at 6.) On February 26, 2024, the Special Master submitted the March 2024 Plan for the Court's approval. (ECF 83-1.) The March 2024 Plan follows the November 2021 Plan's distribution approach. (Id. ¶ 4.) It also describes the Fund's potential offsets using the same language found in the Shareholder Notices issued in connection with the First and Second Interim Distributions and in the section of the Fund's Frequently Asked Questions webpage concerning the Second Interim Distribution. (Id. ¶¶ 4-9.) The Court approved the March 2024 Plan on March 26, 2024. (ECF 89.) The Fund's Fourth Interim Distribution was made in accordance with the terms of the March 2024 Plan.[8]

As of the February 19, 2021 Measurement Date, Mathews owned 833.928 Fund shares. Prior to that, in April and May 2020, 488.654 of Mathews's shares had been sold by her investment manager at inflated NAVs. In June 2020, her investment manager repurchased 435.802 shares at similarly inflated prices. These transactions were conducted as part of a "portfolio rebalancing." Mathews received her share of the First Interim Distribution without any offset, totaling $3,101.96. She did not receive any payments in the Second and Third Interim Distributions. In the Fourth Interim Distribution, Mathews received only a partial payment of $2,078.23.

In a letter dated February 18, 2025 and mailed to the Court, Mathews wrote that the Fund had incorrectly calculated her offset, resulting in her two non-payments and one

---

[8] https://www.infinityqfundliquidation.com/cases/Infinity%20Q/%281%29%20IQ%20Fund%20-%20Shareholder%20Notice%20-%20Fourth%20Interim%20Distribution.pdf (last accessed Oct. 1, 2025).

underpayment. Mathews stated that she was informed by her investment manager that in calculating her offset amount the Fund had only considered her sale of 488.654 shares but not her later repurchase of 435.802 shares. At the Court's request, the Special Master responded to Mathews's letter on March 12, 2025. The Special Master informed Mathews that he had confirmed with Cornerstone Research, the Fund's consultant, that her distributions were correctly calculated. According to the Special Master, these distribution amounts "were based solely on the amounts of the shares [she] owned as of February 18, 2021, minus any offsets based on shares [she] redeemed." Relying on the offset language of the March 2024 Plan, the Special Master concluded that the March 2024 Plan "makes no provision allowing for a reduction in any shareholder's offset based on purchases of Fund shares" and that he "[did] not believe it would be appropriate to do so." The Special Master also noted that "the value associated with any such buybacks represents a claim for damages, for which you may have received a recovery through the settlement of the securities class actions involving the Fund . . . ." He explained that unlike the March 2024 Plan "the class action settlement sought to compensate shareholders for any purchases they made of Fund shares at inflated prices."

        Mathews responded to the Special Master via a letter dated March 21 and mailed to the Court. Mathews opposed the Special Master's conclusion that her offset was properly calculated because there is no basis in the March 2024 Plan for the Fund to take her purchases at inflated prices into account when determining her offset. Mathews argued that the March 2024 Plan's offset language drawn from the section of the Fund's Frequently Asked Questions webpage concerning the Second Interim Distribution, which states that the Fund will "make offsets based on that shareholder's net gains from prior acquisitions and redemptions," shows that both purchases and sales are to be considered when calculating offsets.

On June 25, the Court directed the Special Master to explain why the March 2024 Plan's and webpage's reference to "prior acquisitions" did not enable the Fund to consider Mathews's repurchased shares. (ECF 165 at 2.) The Court also directed the Special Master to explain whether Mathews achieved any "net gains" that would be subject to offset given she repurchased her Fund shares at prices that were similarly inflated to when she sold her shares. (Id.) The Special Master was further directed to address any issues that he deemed pertinent to Mathews's potential entitlement to corrected distributions. (Id.)

In his July 15 response, the Special Master stated that the Shareholder Notices issued in connection with the First and Second Interim Distributions, whose language is included in the March 2024 Plan, make clear by using the phrase "amounts previously received" that offsets are based solely on "net inflation gains" that a shareholder received "in connection with shares that they *sold*." (ECF 167 at 3-4.) As to the "net gains from prior acquisitions and redemptions" language that the Court directed him to address, the Special Master explained that "the offset methodology necessarily considered only what a shareholder actually received on shares that were purchased and then sold by the shareholder at an inflated price." (Id. at 5.) According to the Special Master, the methodology "could not consider other shares that the shareholder purchased but never sold, as the shareholder would not have *received* any gain (or loss) on those other shares, which the shareholder still retains." (Id.) He added that the use of "net gains" in the Frequently Asked Questions webpage "was not intended to convey anything different" from the references to "amounts previously received" and "was instead meant to reiterate that to the extent a shareholder had net gains from a prior purchase *and* redemption at inflated NAVs, those gains on those shares would be used to offset that shareholder's distributions on other shares that were retained." (Id. at 6.) The Special Master also reiterated

that Mathews is in effect asserting a claim against the Fund based on her repurchase of shares at inflated prices, which would have already "been addressed and released through the shareholder class actions filed against the Fund." (Id. at 7.) The Special Master noted that the state court's approved distribution methodology underlying that settlement "calculated each shareholder's approved claim based on each share purchased during the applicable class period and held as of February 18, 2021, measured as an inflation amount multiplied by the purchase price." (Id.) He added that "[a]ccording to documents filed by the settlement administrator in that case [Mathews] did not opt out of the class action settlement" and that "[a]ssuming she made a claim, [Mathews] has already received a distribution relating to the inflated price at which she purchased her shares in the Fund (whether initially or through 'repurchases')." (Id.)

In a letter dated August 25 and mailed to the Court, Mathews responded to the Special Master. Contrary to the Special Master, Mathews interpreted the "net gains from prior acquisitions and redemptions" language to require the Fund to consider a shareholder's total profits (if any) from their purchases and sales of Fund shares, no matter the sequence of the transactions, in calculating any offset. Based on that understanding, Mathews argued that in her case "[t]here was no net gain to justify a decision to take an offset because the subsequent purchase at inflated amounts canceled out the benefit from the sale little more than a month prior." Regarding the Special Master's characterization of the issues she raised as a claim against the Fund, Mathews stated that she is "not seeking damages" but is "merely establishing that both sales and repurchase of [Fund] shares were made at similarly inflated NAVs" and therefore "[t]he subsequent purchase . . . cancels out any gain from the sales."

DISCUSSION

For purposes of this Order, the Court treats Mathews's March 21 and August 25 letters submitted in response to the Special Master's submissions as objections under Rule 53(f)(2). The Court must decide de novo Mathews's objections to the Special Master's recommendation and findings of fact and conclusions of law. See Rule 53(f)(3)-(4).

The Court has carefully reviewed Mathews's and the Special Master's submissions, as well as the documents concerning the Fund's distribution methodology that they rely upon. The Court concludes that neither the November 2021 Plan nor the March 2024 Plan contemplate that a shareholder's offset amount derived from their sale of Fund shares at inflated prices may be reduced based on that shareholder's later repurchase of Fund shares at inflated prices. Accordingly, the Court will adopt the conclusion reached by the Special Master that Mathews is not entitled to greater distribution amounts based on her June 2020 repurchase of 435.802 Fund shares.

The November 2021 Plan makes clear that a shareholder's distribution amounts will not be solely based on the number of shares that they owned on the Measurement Date but will be "less any offsetting claims the Fund has against that [shareholder]." (ECF 83-2 at 7.) Thus, while Mathews owned 833.928 Fund shares as of the Measurement Date, the distribution value of those shares was still subject to reduction by any offsetting claim the Fund had against her. The Shareholder Notices issued in connection with the First, Second, and Third Interim Distributions, each of which was made in accordance with the terms of the November 2021 Plan, provide that offsets are to be based "on any amounts previously received" by a shareholder "on a prior redemption" or "on prior purchases and redemptions" of Fund shares at inflated prices.[9]

---

[9] https://www.infinityqfundliquidation.com/cases/q%20proposal/infinity%20q%20-%20fund_%20shareholder%20notice%20-%20initial%20distribution%20%28final%2011-8-2021%29.pdf;

As used in these Shareholder Notices, the phrase "amounts previously received" is most reasonably interpreted to refer to a shareholder's sale of Fund shares and that shareholder's monetary gain from their sale that is attributable to inflated prices. "Receive" means "to come into possession of".[10] In this context, a shareholder can only be understood to come into possession of "any amounts" upon their "redemption" or sale of Fund shares. Consistent with this interpretation, a shareholder who made "prior purchases" can only come into possession of "any amounts" once they effect later "redemptions" or sales to realize their gains. It would require a strained interpretation of the Shareholder Notices' offset language for the Court to conclude, in line with Mathews's position, that a shareholder who first sells their Fund shares and then repurchases them can still be said to come into possession of the net amount that results from the price differentials of those transactions. The Court declines to adopt that reading and concludes that the Shareholder Notices issued in connection with the First, Second, and Third Interim Distributions only contemplate offsets based on a shareholder's gains from their sales of Fund shares at inflated prices.

The March 2024 Plan utilizes the same distribution methodology as the November 2021 Plan and includes the above offset language from the Shareholder Notices issued in connection with the First and Second Interim Distributions. (ECF 83-1 at 3.) It also includes the offset language from the section of the Fund's Frequently Asked Questions webpage concerning the Second Interim Distribution stating that the Fund will make offsets "based on that shareholder's net gains from prior acquisitions and redemptions of Fund shares," which Mathews

---

https://www.infinityqfundliquidation.com/cases/q%20proposal/iq%20fund_%20shareholder%20notice%20-%20second%20interim%20distribution%20%28april%202022%29.pdf;
https://www.infinityqfundliquidation.com/cases/Infinity%20Q/12.5.2023%20Notice%20of%20Third%20Interim%20Distribution.pdf.
[10] https://www.merriam-webster.com/dictionary/receive (last accessed Oct. 1, 2025).

and the Special Master dispute the meaning of. (Id. at 3-4.) Read alongside the offset language from the Shareholder Notices used in the March 2024 Plan and the offset language used elsewhere in the Frequently Asked Questions webpage, the Court concludes that the meaning of the phrase "net gains" is indistinguishable from the meaning of the phrase "amounts previously received" in that both refer to a shareholder's sale of Fund shares and that shareholder's monetary gain from their sale due to inflated prices.  Another section of the Frequently Asked Questions webpage describes "ACCOUNTS WITH HOLDBACKS FOR NET GAINS" as "accounts for which the Fund is not making one or more interim distributions based on amounts previously received by that shareholder on one or more redemptions of Fund shares . . . .".[11]  This is a strong indication that the phrases "net gains" and "amounts previously received" are used interchangeably when describing the offset methodology.  This reading is further supported by the fact that there is no meaningful difference between the offset language used in the section of the Frequently Asked Questions webpage concerning the Second Interim Distribution and in the Shareholder Notice issued in connection with the same Interim Distribution other than the former's use of "net gains" and the latter's use of "amounts previously received."[12]  Interpreting these two phrases interchangeably also provides a uniform offset methodology in the March 2024 Plan, within which there is no indication that the use of the phrase "net gains" was intended to alter the methodology that the Fund followed in its First and Second Interim Distributions.  In turn, the use of "prior acquisitions and redemptions" in connection with "net gains" is most reasonably read to refer to the realized gains that a shareholder comes into possession of after

---

[11] https://www.infinityqfundliquidation.com/faq.
[12] See id.;
https://www.infinityqfundliquidation.com/cases/q%20proposal/iq%20fund_%20shareholder%20notice%20-%20second%20interim%20distribution%20%28april%202022%29.pdf.

their initial purchase of Fund shares and their later sale of some or all of those shares at higher prices.

There is no dispute that 488.654 of Mathews's shares were sold by her investment manager at inflated NAVs in April and May 2020. Based on the Court's interpretation of the above terms, the Fund was expressly permitted to consider these sales in calculating her offset and distribution amounts. In contrast, the Court has found no language in the relevant documents concerning the Fund's distribution methodology that can reasonably be read to enable, let alone require, the Fund to consider Mathews's later share repurchase in reducing the amount of her offset. Absent such language, the Court declines to alter the distribution approach that the Fund has implemented, which was previously reviewed by the Securities and Exchange Commission and approved by this Court..[13]

CONCLUSION

For these reasons, the Court overrules Mathews's objections to the recommendation and findings of fact and conclusions of law of the Special Master and, upon de novo review, adopts them in their entirety insofar that Mathews's distributions were properly offset based solely on the sale of 488.654 of her shares at inflated NAVs in April and May 2020.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
October 1, 2025

---

[13] The Court takes no position on whether the precise dollar amount of Mathews's offset was correctly calculated.

- 12 -

COPY MAILED TO: Nell Elizabeth Mathews, 2643 Arcola Lane, Wayzata, MN 55391